## *Ex parte* Screws.

### *Application for Mandamus to Secretary of State.*

*Legality of conflicting legislatures of* 1872–73. — The body of men who assembled in the United States Court-room in the city of Montgomery, on the third Monday in November, 1872, claiming to be the General Assembly of the State, having had a majority of the members legally elected to each house, as ascertained on the subsequent organization effected under the plan submitted by the Attorney General of the United States, was the lawful legislature of the State, although it did not assemble in the capitol, and the lieutenant-governor did not preside in the Senate; and its election of a public printer on the 10th December, 1872, was valid. (SAFFOLD, J., dissenting, held that a bare majority of the members elect cannot constitute a lawful legislature, unless the minority are absent either necessarily or wilfully, without fault on the part of the majority.)

IN this case, a motion was entered on the docket of this court, on the 27th February, 1873, in these words: " Motion

is made by W. W. Screws, for a *mandamus* to Pat. Ragland, secretary of State, commanding him to deliver to said Screws, to be printed, the laws of the State of Alabama passed during the present session of the General Assembly, and the laws passed by the Board of Education at its recent session, and to recognize said Screws as the public printer of the State, until his successor is duly elected and qualified; and for such other remedial writ as may be necessary, on the facts set forth in the record herewith filed, and prayed to be taken as a part of this motion, marked 'Exhibit 1.'"

There is no record or transcript in the case. "Exhibit 1," as it has come to the hands of the reporter, consists of several distinct papers, some written and some printed, which are connected together by a small brass clasp, such as is commonly used for fastening sheets of paper together. The first of these papers is the original petition of said Screws, addressed to Hon. Jno. D. Cunningham, Judge of the City Court of Montgomery, asking for a *mandamus* to compel said Ragland, as secretary of State, to recognize him as public printer, and to deliver to him, for publication, as required by law, the laws enacted by the General Assembly and the Board of Education; which petition was sworn to by the petitioner on the 25th February, 1873, and was indorsed by Judge Cunningham, "*Mandamus denied.*" In this petition, said Screws claimed to be public printer under and by virtue of his election to that office by the General Assembly in December, 1870, and the provisions of the law, which declares that the public printer shall be elected for the term of two years, and shall continue in office until his successor is duly elected and qualified; and he alleged that no one had yet been elected to succeed him in that office.

The next paper is the answer of said Ragland to said petition, and consists of two long printed slips, in the form of columns of a newspaper. In this answer, Ragland admitted the election of said Screws as public printer, as alleged in his petition, "and that he has never been removed from said office, unless the facts hereinafter stated constitute in law such removal;" and he then alleged the following facts:—

"Respondent states, upon information and belief, that on the third Monday in November, 1872, two bodies met in the city of Montgomery, each of which was made up of what claimed to be a Senate and House of Representatives, and then, for several days thereafter, claimed to be the General Assembly of Alabama; that one of these bodies met in the United States Court-room in said city, and the other met in the rooms in the capitol in said city heretofore and now known and used as the Senate Chamber and Hall of the House of

Representatives. As to the two houses which thus met in the capitol, and which claimed to be the General Assembly of Alabama, respondent says that they met in the state capitol on Monday, November 18, 1872 ; the body which claimed to be the Senate convened in the Senate Chamber, and the body which claimed to be the House of Representatives convened in the Hall of the House of Representatives. Each of said houses organized in the manner usual for the organization of the General Assembly of Alabama. In organizing the body claiming to be the Senate, Lieutenant-Governor E. H. Moren presided, who was duly elected Lieutenant-governor of the State of Alabama at the general election held in 1870, and regularly installed in said office after his election, and who continually held and occupied said office, from the date of his election and installation, up to the date of the election and installation of his successor, Hon. Alex. McKinstry. Respondent thereupon says that said E. H. Moren, at the time he presided in the organization of said body, was the lieutenant-governor of said State. In organizing the body claiming to be the House of Representatives, Hon. John P. Hubbard, of Pike County, presided. Said Hubbard, being a representative from Pike County, was duly elected Speaker of the House of Representatives, at the regular session of the General Assembly of Alabama, which convened in the capitol, in the city of Montgomery, in the month of November, 1870. At the date of said organization last mentioned, he had never resigned, nor been removed from said office of speaker, and was the Speaker of the House of Representatives of the General Assembly of Alabama, and presided as such during the regular session of the General Assembly in the year 1871, and was such speaker at the adjournment *sine die* of said General Assembly. Each of said two bodies, claiming to be the General Assembly of Alabama as aforesaid, elected the necessary officers which are usually elected in organizing a regular General Assembly of Alabama. The body claiming to be the House of Representatives elected Hon. Lewis M. Stone as its speaker, he being at that time, and now, a representative, or member from Pickens. County. Said two bodies, claiming to be the General Assembly of Alabama, continued in regular session, under and pursuant to their organization as aforesaid, until an organization of the General Assembly of the State was effected under and pursuant to the plan submitted by the Hon. Geo. H. Williams, Attorney General of the United States; which plan was submitted by him about the 17th day of December, 1872, or shortly thereafter. During the time of their said session, said two bodies at the capitol did, in the usual and regular mode, enact one or more of what they claimed to be statute laws of

Alabama, which were approved as laws by his excellency, Hon. Robert B. Lindsay, as Governor of Alabama, and who was at the time Governor of Alabama; one of which said laws was an act in relation to the Board of Commissioners of the River, Bay, and Harbor of Mobile, passed and approved November 23, 1872.

" Said Robert B. Lindsay, who was elected Governor of the State of Alabama at the general election in 1870, and regularly installed into said office, remained the governor of said State until he was succeeded in said office by Hon. David P. Lewis, the present governor, which was about the 24th day of November, 1872, or shortly thereafter. Said R. B. Lindsay, while he was governor as aforesaid, and as such governor, during the session of said two bodies at the capitol, recognized and had official communication with said two bodies as the General Assembly of Alabama, and, on the 19th day of November, 1872, directly and distinctly refused to recognize as the General Assembly of Alabama the body claiming to be such which convened in the United States Court-room in the city of Montgomery, and refused to have official communication, as Governor of Alabama, with said court-house body as the General Assembly of the State; and said Governor Lindsay never did recognize said last-mentioned body as the General Assembly of Alabama. The said body at the capitol, claiming to be the Legislature of Alabama, did, on the 22d and 23d days of November, 1872, in the afternoon session of said days, as prescribed by law, open and count the votes, and declare the result of the general election of the State in November, 1872; and immediately after the count, and under the same, Hon. David P. Lewis took the oath of office as governor, and Hon. Alex. McKinstry took the oath of office as lieutenant-governor. Respondent hereto attaches the proceedings of the body known as the ' Capitol Legislature,' the communications of R. B. Lindsay to the same, and the plan of organization submitted by the Attorney General of the United States, marked ' Exhibit A,' wherein appear more fully the matters and things herein stated, and which he prays may be taken as a part of his answer.

" And respondent avers, upon information and belief, that in the body known as the capitol legislature there were, at its organization, seventeen members in the Senate thereof, holding certificates of election issued to them respectively by the secretary of State, under the election laws of Alabama; and that there were in the said house, on the day of its organization, participating in the same, more than fifty members holding certificates of election issued to them respectively by the secretary of State, under the election laws of Alabama.

And respondent further avers, on information and belief, that in the body known as the court-house legislature there were not on the day of its organization, and never were, as many as seventeen Senators, holding certificates of election issued to them by the secretary of State, under the election laws of Alabama; and that in the said House of Representatives of said court-house legislature there were not on the day of its organization, and never were, more than fifty members holding certificates of election issued to them respectively under the election laws of Alabama.

" The said plan of said Attorney General of the United States, after the alleged election of Arthur Bingham as state printer by said court-house legislature, was adopted by each of said legislatures, or general assemblies, and was recommended and sanctioned by the present governor, Hon. D. P. Lewis, both before and after its adoption by each of said bodies; and after the adoption of said plan, the present and now acting General Assembly, and each house hereof, was fully and completely organized, under and in pursuance of said plan, and has ever since been acting as the General Assembly of the State, and has been, and still is, recognized by the governor, and by the people generally, as the lawful General Assembly of Alabama. This last mentioned organization occurred long after the alleged election of said Bingham, and long after the issue of said commission to him, as mentioned herein. Respondent further states, that if the facts herein stated show that said Arthur Bingham has been duly and legally elected and qualified as the successor of said petitioner in said office of public printer, then, upon these facts, respondent answers that said Bingham is, by force and virtue of said facts, the duly and legally elected and qualified successor of said petitioner. There has been no other election or qualification of a successor to petitioner in said office than is disclosed in this answer. Petitioner claims to be the state printer, and bases his claim upon the facts stated in his said petition. Said Arthur Bingham also claims to be the state printer, and that he is the duly elected and qualified successor of petitioner in said office; and he bases his claims upon the facts herein disclosed. Each of said claimants demands that his claim be officially recognized by respondent; but respondent, not knowing which one is the rightful claimant, and being determined to obey the law, so far as he can ascertain it, has refused, and still refuses, to recognize either as the rightful claimant, until some tribunal, authorized by law to determine such conflicting claims to said office, has determined the question, so that he may then, without peril to himself, take the course pointed out by such tribunal."

There is an apparent omission, or mistake, in this answer,

as it speaks of the election of Arthur Bingham, and the issue of a commission to him, as if those facts had been already stated therein. Said Bingham was, in fact, elected state printer by the " court-house legislature," on the 10th day of December, 1872, and executed his official bond as required by law, which was approved by the governor on the 12th December; and a commission was issued to him by Governor Lewis on the 18th December; but these facts nowhere appear in these papers. " Exhibit, A," annexed to the answer, consists of newspaper slips, containing reports of the daily proceedings of each house .of the " capitol legislature," up to the 18th December, when the new House of Representatives was organized under the plan submitted by the attorney general; also, a printed copy of the attorney general's letter, which was dated " Washington, D. C., December 11, 1872," and of Governor Lindsay's letter to the committee of the " court-house legislature," refusing to recognize that body as the General Assembly.

At the foot of this printed answer, there is an agreement, also printed, and signed by the counsel of both Screws and Ragland, in these words : " As attorneys of the petitioners and respondent, we agree that the facts alleged, stated, and admitted in the foregoing answer of the respondent are correctly and truly stated; and we consent and agree that if, upon these facts, the petitioner is by law entitled to the relief sought by his petition, or to any part thereof, then a peremptory *mandamus*, to the extent he is so entitled, may be awarded by the City Court of Montgomery, and issued without any previous rule to show cause; but this agreement is subject to the right of appeal to the Supreme Court, which is hereby expressly reserved to each party." If there was any other agreement between the parties, or their counsel, as to the facts of the case, it is not a matter of record, and is not shown by any of the papers which have come to the hands of the reporter.

WATTS & TROY, and JUDGE &. HOLTZCLAW, for the petitioner.

ALEX. WHITE and RICE, JONES & WILEY, *contra*.

PECK, C. J. — This important case has been pressed upon the court at the very heel of the term, while much other necessary business remained to be disposed of, before the final adjournment. Less than forty-eight hours remained to us, after the record and briefs, and arguments of the counsel, came to our hands. This time has mainly been employed in examining the case. The record, the facts settled and agreed upon by the parties, with the arguments of counsel, to enable us to

[Ex parte Screws.]

reach, if possible, a correct conclusion, which I hope we have succeeded in doing; but no time remained to write out at length the opinion of the court, setting out the reasons that conducted us to the result. This result I now proceed to read, as follows : —

1. Every officer who, by the Constitution or laws of the State, is required to be elected by the people, derives his right to the office by his election; and the evidence of his election, in the first place, usually is the certificate of the proper officer ; or, if he is an officer who, by the Constitution or laws, is required to be commissioned by the governor, then his commission is the evidence. This evidence, the certificate or commission, is not conclusive, but *primâ facie* evidence only, which may be overcome or destroyed by better evidence, to wit, by the judgment of a competent court, if he is an executive or judicial officer ; if a legislative officer, — a senator, or representative of the General Assembly, — then, such better evidence is the determination of the legislative body of which he claims to be a member, to wit, the Senate, or House of Representatives, declaring him to be, or not to be, a member of said body. Each house of the General Assembly is, by the Constitution, made the sole judge of the qualifications, elections, and returns of its own members. Art. IV. § 6. When, therefore, either house declares that a certain person is a member of its body, that is final and conclusive, and no court can go behind it.

The Senate and House of Representatives, each, since their organization under the proposal of the Attorney General of the United States, made for that purpose, has declared, that certain persons who had no certificates of election were elected by the people ; and certain other persons who had certificates of election were not elected by the people ; and the first named persons have been declared and recognized as members of the respective houses. This is conclusive upon us, and we have no power to review or revise what has thus been done. These persons, if elected by the qualified electors, were members of the General Assembly, from the day of their election ; and, being members, then, the two bodies, who convened and organized at the court-house in Montgomery, had a majority in both houses; and having such majority, when recognized by the governor, were a constitutional General Assembly, and were competent to do any act, as a General Assembly, except such acts as can only be done by a majority of two thirds of the members of each house. They could elect a public printer, or a senator to the Congress of the United States.

I do not regard it necessary that the General Assembly should convene and organize in the capitol building; neither the Constitution, nor any law of the State, requires this. They

[Ex parte Screws.]

are required to convene in Montgomery, — not in the capitol building; nor, in the organization, is it necessary that the lieutenant-governor or the speaker be present. These officers preside, — the lieutenant-governor over the Senate, and the speaker over the House of Representatives, after they are organized, not necessarily before.

2. The statement of facts in this case, settled and agreed upon by the parties, shows that on the 10th day of December, 1872, the bodies that convened and organized at the court-house in Montgomery, claiming to be the General Assembly, were recognized by the governor as the General Assembly of the State of Alabama, and elected Arthur Bingham, the public printer of the State. We hold that, notwithstanding the peculiar circumstances attending the meeting and organization of said bodies, and their recognition by the governor, said election was not void, but valid; and that, as said Bingham has given his official bond, which was approved of by the governor, and has received a commission as public printer, &c., he is to be regarded as the public printer of the State, and entitled to all the privileges and emoluments of said office, and authorized to discharge the duties of the same; consequently, the decision of the City Court, denying the writ of *mandamus*, prayed for by petitioner in his petition, is free from error, and must be affirmed at petitioner's cost.

PETERS, J. — I concur not only in the reasoning, but also in the conclusions of the opinion of the Chief Justice, which has just been read in this case. The state printer is an officer elected by the General Assembly, at the time appointed by law. That time had arrived when the election of Mr. Bingham was made in this case. After the election of the state printer by the General Assembly, he is required to give bond, as prescribed by the statute, and to take the constitutional oath of office. Rev. Code, §§ 123, 126, 127; Const. of Ala. 1867, Art. XV. § 1. When this is done, he becomes one of the executive officers of the State. And although he is not one of those officers specially required to be commissioned by the governor, yet the governor alone can approve his bond. And if, as evidence of this approval, and of the proper qualification of the officer so appointed to discharge the functions of his office, he is commissioned by the governor, this court cannot say that such commission has been inadvertently issued, and step in and aid the Chief Executive of the State in the manner of performing his duties, or perform them for him. Rev. Code, §§ 126, 148. We must presume that the governor knows his own duties, and how to perform them; and that he would not approve the bond, and commission any person as state printer, without the

proper evidence of his. appointment by the proper authority. " And particularly, when this is done during the session of the General Assembly, and with their full knowledge; and while that body, having control, for the time being, of the sovereign power of the State over the very question in controversy, acquiesces in such approval and commission; when this is the case, the courts have no other alternative than to acquiesce also. This is necessarily so, at least until the General Assembly, which speaks the legislative mind of the people of the State, shall declare otherwise. Then it will become the duty of the governor, and of this court, to conform to this declaration of legislative will. Otherwise, a state printer may be made by this court, against the will of the General Assembly and the commission of the governor. This is not a power vested in this tribunal. An office, created and filled by the General Assembly, is a revocable franchise given by statute. It may also be taken away or abolished by the statute, unless it is protected by a constitutional provision. *Perkins* v. *Corbin*, 45 Ala. 103. Such office is not a vested right, which is above legislative control. Then, in what way the legislature shall bestow it, or in what manner that body shall put an end to it, is a matter over which they exercise the sole, unlimited, sovereign power. 45 Ala. 103, *supra*.

If I had much greater doubt about the regularity of the organization of the legislative body that elected Arthur Bingham state printer, on the 10th day of December last, than I do, I would still feel a very grave reluctance to declare such election void. The constituent elements of the same body are still acting in the capacity of the General Assembly of this State, and they have not, and do not, repudiate the election thus made. It is their affair. If they are content with it, they have the power and the right to be so content. In this matter, they alone speak the sovereign will; and in this they must be followed by the courts. No judgment of this court, or any other, so long as they act within their constitutional limits, can reverse or interfere with their decisions. In such a matter, they are, a law unto themselves. They are the sole judges of the thing to be done, and the manner in which it should be done. Their action, however irregular it may be when compared with former usage, is the law with them, and it is equally the law of this court. Until they choose to change their action, it must be final with this tribunal. Courts cannot regulate legislatures, but legislatures can regulate courts. It is the duty of the courts, so far as they can, to find out the legislative will, and to follow it in their judgments. Guided by this maxim, I can do no more than to concur with the venerable Chief Justice of

this court, in declaring Arthur Bingham state printer, until it is the will of the General Assembly to determine otherwise.

The legislative body may make mistakes. They may do wrong. They may commit what the over-fastidious may pronounce serious blunders. They are but men, and humanity is never, in a legislative sense, infallible. But this court can only interfere to control their mistakes, should such mistakes occur, when they involve a disregard of some constitutional restraint, or limitation of their powers, in the enactment of a law. Beyond this, courts cannot go. *Non nostrum est tantas componere lites.* See *Challefoux et al.* v. *Ducharme et al.* 4 Wis. 554; *Kottam et al.* v. *Ayer*, 3 Strob. 92; *Drake, ex rel.* v. *Mahaney*, 13 Mich. 481; *The State* v. *Johnson*, 17 Ark. 407; *Marbury* v. *Madison*, 1 Cranch, 137; and *Luther* v. *Borden*, 7 How. U. S. R. 1 *et seq.*

The judgment of the court below is free from error, and should be affirmed.

B. F. SAFFOLD, J. (dissenting.) — I concur with the Chief Justice in the following propositions: 1. That it is not indispensable to the organization and existence of the General Assembly that it should meet in the capitol, or be presided over in the Senate by the lieutenant-governor, and in the House of Representatives by the speaker, or be recognized by the governor. 2. That the members thereof derive their authority to act, as such, from their election by the people, and not otherwise. But I maintain that there are cases in which there is no General Assembly, notwithstanding a majority of each house may meet at a time and place appointed by law, and organize and assume to be the General Assembly, and that the present is such a case.

We know now who are entitled as members thereof to compose the General Assembly, because it has been ascertained by an undoubted General Assembly. It appears from the finding that the prior assemblage at the capitol lacked the indispensable requisite of a General Assembly, to wit, a majority of the members of each house. This was the only defect of that assemblage, either in form or substance. But it is vital, and fatal to its claim to be the General Assembly. The assemblage at the United States Court-room, lacking every mere form in its organization, had, as has been subsequently ascertained, a majority of the duly elected members of each house. In refusing to attend at the capitol, and in organizing at another place, its members staked their defence upon the *truth* of their claim to be a majority of each house. The result of a proper investigation vindicated this claim, and prevented the other body from constituting the General Assembly. Necessity is a

law. But the validity of acts, dependent alone upon it, fails, if there was not the necessity. The court-house assemblage might have been held to have been the legislature, if nothing else had transpired within a reasonable time.

Appeal was made by each claimant to the President of the United States for recognition. One body was meditating the impeachment of the governor for refusing to recognize it, and both were proceeding to declare vacant the seats of members who belonged to the other. Nothing but force could have decided the dispute, if it had not been for the intervention of the President through the United States Attorney General. In obedience to his suggestion, the House of Representatives readily organized, and awaited the organization of the Senate, which was effected some time afterwards. The most important of the contested seats have been determined in this new organization, by the whole number of members undoubtedly entitled to seats, and others are awaiting its action. Notwithstanding this inquest determined that the court-house assemblage had a majority of each house, I insist it was not the General Assembly.

A legislature, to be such, must, of course, have all the powers which it may exercise. Some of the powers require to be exercised by two thirds of each house. Can a bare majority, in favor of such exercise in a particular instance, expel the minority opposed, or refuse to let them meet with them? May the majority, wherever congregated in the city of Montgomery, assume on the instant to be the legislature, and pass a law? These extreme cases suggest the right, both of the minority and of the people, to have their voice in the passage of the laws, or the performance of other duties by the legislature. The rule I deduce for determining the right of the majority to hold a session of the legislature, and the right of the minority to be present, without which the majority cannot legislate, is this: The minority must be absent, either necessarily or wilfully, without fault on the part of the majority, to enable the latter to hold such session. If they are sick, or unable from any cause to come, or if they are refractory, and will not come, the majority may proceed without them. But if their absence proceeds from a reasonable belief that the body claiming their attendance has no right to do so, their objections ought to be removed through conference with them, or they should be placed in fault by such attempt, so that they may be brought in by compulsion. When a large number are absent, their attendance ought to be compelled; because the people have a right to the influence they may exert, and also to have all doubts about the validity of the legislature removed.

In this instance, the conference was held, and resulted in the proper organization of the assembly according to all the forms of law. No necessity exists now for regarding the court-house assemblage as the General Assembly; and without such necessity it ought not to be so regarded. The undoubted General Assembly has been in session more than a month, with the question of the validity of the claims of the former assemblages to be such constantly before it; and it has been unable to formally ratify or repudiate either, while the acts of both, with some exception, have been ignored or revised.

The Convention Parliament, which restored Charles II., met without the summons of the king; and the first thing done after the king's return was to pass an act declaring it to be a good parliament, notwithstanding the defect of the king's writs. Blackstone says the meeting was for the necessity of the thing, which supersedes all law; for if they had not so met, it was morally impossible that the kingdom should have been settled in peace. So, at the time of the Revolution in 1688, the Lords and Commons, by their own authority, met in a convention, and disposed of the crown and kingdom. This assembling was upon a like principle of necessity as at the Restoration, — that is, upon a full conviction that King James II. had abdicated the government, and that the throne was thereby vacant, *which supposition of the individual members* was confirmed by their concurrent resolution when they actually came together. The Convention was declared to be really the two Houses of Parliament, notwithstanding the want of writs, or other defects of form, by statute. 1 Wm. & M. St. 1 ch. 1; 1 Blackstone's Com. m. p. 151, 152.

In the *People* v. *Hatch* (33 Ill. 9), a portion of the members of the legislature came together, and assumed to act as the legislature, after it had been adjourned by the governor, under a misapprehension of a disagreement between the two houses about adjournment. The members had been disconcerted by the prorogation, and for twelve days had taken no action. This was considered an acquiescence in the action of the governor, and the subsequent assembling was declared by the court not to have been a meeting of the legislature. In that case, every ingredient of validity seems to have existed: a meeting at a time and place appointed by law; no dispute as to membership; a session begun, and not actually terminated; an admitted mistake of the governor in proroguing the body; disconcertion of the members, rather than acquiescence.

How easy will it be, when the parties into which the members may be divided are nearly equal, for a sufficient number of seats to be contested, to raise genuine doubts about who are entitled to them? The State is liable to be convulsed on the

[Ex parte Collins.]

most frivolous occasions and long afterwards private citizens may be greatly injured, without fault of theirs, by judicial determination of the validity of laws, which they were unable in any way correctly to determine for themselves. Such doubt and difficulty now exist in this State; and to the beneficent interposition of the federal authority alone are we indebted for the privilege of deciding this case before a civil tribunal, rather than having it submitted to the crude arbitrament of intestine strife.