671 So.2d 1334 (1995)
Woodrow SMITH, as Administrator of the Estate of Annie Jo Smith, Deceased
v.
William J. SCHULTE, M.D., et al.
William J. SCHULTE, M.D., and Pulmonary Associates of Mobile, P.A.
v.
Woodrow SMITH, as Administrator of the Estate of Annie Jo Smith, Deceased.
1930362, 1930459.
Supreme Court of Alabama.
August 18, 1995.
Rehearing Overruled December 15, 1995.
Certiorari Denied May 28, 1996.
*1335 Andrew T. Citrin; John T. Crowder, Jr.; Michael A. Worel, and David G. Wirtes, Jr., of Cunningham, Bounds, Yance, Crowder and Brown, Mobile, for appellant/cross appellee Smith.
Jerry A. McDowell of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, for William J. Schulte, M.D.
W. Boyd Reeves, Robert J. Mullican, and Tara T. Bostick of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for William J. Schulte, M.D., and Pulmonary Associates of Mobile, P.A.
Patrick H. Sims of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, for Pulmonary Associates of Mobile, P.A.
Thomas H. Keene and Amy C. Vibbart, Montgomery, amicus curiae Medical Association of the State of Alabama.
Certiorari Denied May 28, 1996. See 116 S.Ct. 1849.
PER CURIAM.
Woodrow Smith, as administrator of his deceased wife's estate, appeals from a judgment reducing to $1,276,873 a jury's $4,500,000 punitive damages award in his wrongful *1336 death action against William J. Schulte, M.D., and Pulmonary Associates of Mobile, P.A. ("PAM"). Schulte and PAM cross appeal from that judgment.
On September 28, 1989, Annie Jo Smith was involved in an automobile accident in which she suffered contusions to the upper body and multiple fractures, including fractures of the ribs and hip. She was admitted to Knollwood Park Hospital in Mobile, where she was surgically treated for the fractured hip and was placed in the intensive care unit. Because she was breathing with difficulty, she was given supplemental oxygen externally, specifically, by an oxygen "mask," at a volume of 40%.
Throughout the night and the next day, her breathing difficulties increased progressively, and "pulmonologists" with PAM were summoned to consult and participate in her treatment. By 7:30 a.m., September 30, when she was first attended by Dr. Schulte, Mrs. Smith's breathing difficulties had not lessened, despite the fact that her supplemental oxygen supply had been increased to a concentration of 100%. Moreover, test results suggested that she had begun suffering from "adult respiratory distress syndrome" ("ARDS"), pneumonia, and one or more additional infections.
Dr. Schulte concluded that her respiratory condition required mechanical oxygenation an internally inserted "endotracheal tube" connected to a mechanical "ventilator." Between 9:05 a.m. and 9:15 a.m., he inserted an endotracheal tube through a passageway in her throat. As she was being "intubated" in this manner, Mrs. Smith became "combative." Doctor Schulte then ordered the administration of Pavulon, a drug that, within 30 seconds of administration, paralyzes striated muscles and renders all voluntary muscular activityincluding breathingimpossible.
Coincident with the cessation of her voluntary movement, Mrs. Smith's blood pressure began falling; it continued to fall until 9:15 a.m., by which time she had lost all blood pressure and experienced a "cardiac arrest." After Dr. Schulte and accompanying medical personnel had initiated cardiopulmonary rescusitation and other measures calculated to revive her, Dr. Schulte noticed "gastric contents in the tube"; that fact revealed that the endotracheal tube had, in fact, passed through Mrs. Smith's esophagus into her stomach instead of into her lungs. Subsequently, a new endotracheal tube was properly inserted; however, Mrs. Smith, who had by that time lost consciousness, never revived.
She died four days later, October 4, 1989. An autopsy revealed that the "immediate cause of death" was "anoxic encephalopathy, cerebral edema with brain stem herniation." More colloquially stated, Mrs. Smith had suffered a period of oxygen deprivation that caused her brain to swell out of its cavity and force its way "down into the spinal canal."
On April 19, 1990, Woodrow Smith, as administrator of his wife's estate, sued Dr. Schulte and PAM. The complaint alleged that Dr. Schulte had "passed the [endotracheal] tube into the esophagus, [and had left the] tube for a period of time so that it produced brain death and cardiac arrest," followed by "the wrongful, premature" death of Mrs. Smith. The cause was tried to a jury, which, on April 6, 1993, returned a verdict for Mr. Smith in the amount of $4,500,000.
On April 23, 1993, Dr. Schulte and PAM filed a motion requesting reduction of the verdict to $1,000,000, with consumer-price-index adjustments, the amount of the damages limitation set forth in Ala.Code 1975, § 6-5-547. On November 5, 1993, the trial court conducted a post-verdict review of the damages award, as required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). At this hearing, Smith renewed an argument he had made before trial, namely, that § 6-5-547 violates rights guaranteed him by the Constitution of Alabama.
Following this hearing, the trial court concluded that the verdict was supported by the evidence and was not excessive. It also rejected *1337 Smith's constitutional challenges, however, and applied the damages limitation set forth in the statute. Consequently, it entered a judgment for Smith in the amount of $1,276,873. From that judgment, all the parties appealed. In case number 1930362, Smith challenges the constitutionality of § 6-5-547, and, consequently, the reduction of the verdict. In case number 1930459, Dr. Schulte and PAM challenge the judgment, contending that the verdict on which it was based was excessive.

I. Case Number 1930362
Smith challenges on two grounds the constitutionality of § 6-5-547, which provides in pertinent part:
"In any action commenced pursuant to Section 6-5-391 or Section 6-5-410, against a health care provider whether in contract or in tort based on a breach of the standard of care the amount of any judgment entered in favor of the plaintiff shall not exceed the sum of $1,000,000. Any verdict returned in any such action which exceeds $1,000,000 shall be reduced to $1,000,000 by the trial court or such lesser sum as the trial court deems appropriate in accordance with prevailing standards for reducing excessive verdicts.... The maximum amount payable under this section, $1,000,000, shall be adjusted on April fifteenth of each year to reflect any increase or decrease during the preceding calendar year in the consumer price index of the United States Department of Commerce. Said adjustment shall equal the percentage change in the consumer price index during the preceding calendar year."
(Emphasis added.) He contends (1) that § 6-5-547 violates the constitutional provisions guaranteeing the equal protection of the laws, and (2) that it violates the constitutional provision guaranteeing the right to a trial by jury. We shall address those contentions in that order. Moreover, because Smith does not challenge § 6-5-547 under any provision of the United States Constitution, our analyses and conclusions are based entirely on adequate and independent state law grounds.

A. Equal Protection
Smith bases his equal protection argument on Moore v. Mobile Infirmary Association, 592 So.2d 156 (Ala.1991), in which four Justices of this Court concluded that Ala.Code 1975, § 6-5-544(b),[1] violated the equal protection guarantee arising under the Alabama Constitution. More specifically, the plurality concluded that the statute represented unreasonable "`class legislation arbitrarily discriminatory against some and favoring others in like circumstances.'" 592 So.2d at 165 (quoting Opinion of the Justices, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949)) (plurality opinion). One Justice declined to "express [an] opinion" on the equal protection question, because he had already joined with four other Justices in the preceding section of Moore, holding that § 6-5-544(b) violated the right to a trial by jury. 592 So.2d at 178 (Almon, J., concurring specially). We now hold that § 6-5-547 represents a similar form of "class legislation" that is unreasonable, and, therefore, violates the equal protection guarantee of the Constitution of Alabama.
In reaching its conclusion, the plurality reiterated a previously established principle, namely, that the analysis of a claim alleging a violation of the equal protection afforded by our state constitution does not parallel, or necessarily produce the same result as, an analysis based on the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Moore, 592 So.2d at 170. The Alabama constitution allows the legislature to classify citizens in order to effect some "public interest," the plurality explained, only insofar as the resultant burden on individual rights or *1338 liberties does not outweigh the benefits effected by the statute. Id. at 166. In other words, "whether the classifications created under [the challenged statute] represent a reasonable exercise of legislative power depends on whether they are reasonably related to the stated objective, and on whether the benefit sought to be bestowed upon society outweighs the detriment to private rights occasioned by the statute." Id. (emphasis added).[2] One factor to be weighed in this determination is the relative importance of the private right or interest burdened by the statute.
While conceding that the Moore plurality applied a more rigorous standard of review than the Fourteenth Amendment would, arguably, have required, Dr. Schulte and PAM dispute the correctness of the Moore plurality's conclusion. Moreover, they attempt to distinguish § 6-5-547 from the statute reviewed in Moore, on the basis of the species of damages affected; whereas Moore involved a limitation on compensatory damages, § 6-5-547involved herelimits recovery of punitive damages. This distinction is important, because, they contend, the "[a]pplication of a damages cap in a wrongful death action ... does not affect property rights." Brief of Appellees/Cross Appellants, at 19 (emphasis added). They insist that "[p]laintiffs have no property rights in punitive damages [in] a wrongful death action." Id. (emphasis added). They urge this Court to apply the "minimum scrutiny" standard, id. at 20a standard developed by the federal judiciary under the Fourteenth Amendment for reviewing legislation affecting "neither a `suspect class' nor a `fundamental right,'" Gideon v. Alabama State Ethics Comm'n, 379 So.2d 570, 574 (Ala.1980) which standard it typically applies to "economic legislation." Brief of Appellees/Cross Appellants, at 20.[3] The defendants insist that this standard is applicable here, because, they argue, Smith's cause of action involves no fundamental rights. We disagree with this argument.
In Alabama, citizens enjoy a fundamental right not to be deprived of liberty and life as a consequence of fatal malpractice. Cf. Breed v. Atlanta, B. & C.R.R., 241 Ala. 640, 642, 4 So.2d 315, 316 (1941) (purpose of wrongful death actions is to "stimulate diligence in the protection of [a person's] natural right to live, without respect to the personal condition or disability of the person so protected"). Personal representatives of victims of fatal malfeasance, acting as agents of the citizen body, seek to vindicate the abridgment of that interest. Id.; Richmond & D.R.R. v. Freeman, 97 Ala. 289, 293, 11 So. 800 (1892) (recovery for wrongful death serves as "retribution for the wrong" committed).
This "liberty" interest derives in a measure from the fact that "Alabama is the only state in which" recovery for wrongful death has been judicially restricted to punitive damages. Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1262 (Ala.1986). The "punitive only" rule is an outgrowth of the strong public policy served by the right of this action in Alabama, which policy is "the preservation of human life." Id. at 1258 (emphasis added). The rule meticulously "distinguish[es] between the value of human life in general" and "the value of a particular life." Atkins v. Lee, 603 So.2d 937, 942 (Ala.1992) (emphasis in original). In resting, as they do, on the inestimable "value of human life in general," id., the fundamental tenets underlying Alabama's right of action for wrongful death are entirely inconsistent with the imposition of "an arbitrary cap" on that value. *1339 Killough v. Jahandarfard, 578 So.2d 1041, 1044 (Ala.1991).
As a matter of logic, the personal representative of a victim of fatal medical malpractice has a greater interest in the aggressive prosecution of a wrongful death claim for the species of damages recoverable than does the victim who survives to seek the species of damages involved in Moore. The importance of this liberty interest is a factor that figures prominently in our consideration of the equal protection challenge to § 6-5-547.
Section 6-5-547 offends Alabama's equal protection guarantee, Smith contends, by creating multiple classes of citizens, based on the involvement of a medical provider. First, he insists that the statute creates "special classes" of wrongful death parties, composed of defendant medical malefactors and the personal representatives of their victims. Brief of Plaintiff/Appellant/Cross-Appellee, at 31. In other words, he argues, the parties in this class of wrongful death action are subject to the statutory damages limitation, while the parties in all other classes of wrongful death actions are subject to no such limitation. Second, Smith contends that § 6-5-547 further sub classifies these parties, according to the reprehensibility of the defendant's conduct, that is, by separating those tort-feasors whose conduct warrants damages in excess of the cap from those whose conduct does not.
We agree that § 6-5-547 displays these features, and we conclude that § 6-5-547 functionsmechanically, at leastin every material respect as did the damages cap legislation addressed in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993) (invalidating on the right-to-trial-by-jury grounds Ala.Code 1975, § 6-11-21); and in Moore v. Mobile Infirmary Association, supra. Also, § 6-5-547 and § 6-5-544(b), the sections involved in Moore, originally were adopted as §§ 8 and 5, respectively, of the Medical Liability Act of 1987, Act No. 87-189, 1987 Ala.Acts; they were, therefore, both enacted for the purpose expressed in § 6-5-540.[4] For these reasons, the issue in this case is, as the plurality stated in Moore, "whether the connection between the benefit sought to be conferred on society and the means employed to accomplish it, when weighed against the inequalities created by the statute's classifications, is so attenuated and remote as to constitute an unreasonable exercise of police power." 592 So.2d at 167. Because the issue in this case parallels the one in Moore and requires a parallel analysis, we quote the Moore plurality's discussion at length:
"A seminal study conducted by the United States General Accounting Office (`GAO') suggests that the connection between damages caps and the total cost of health care is ... remote.
"In response to a request from members of Congress, the GAO conducted a study on, inter alia, the effect on malpractice insurance of various statutory reforms enacted in response to the escalation of insurance costs of the 1970's. The GAO issued its findings in 1986 and 1987 through a series of published reports.
"The GAO study found `no consensus among the interest groups [surveyed] that *1340 any of the reforms implemented in response to the situation experienced in the mid-1970's ... had a major effect' on the cost of malpractice insurance. General Accounting Office, Medical Malpractice: No Agreement on the Problems or Solutions, HRD-86-50 (February 1986), at 3 (`HRD-86-50'). Despite the fact that statutory reform, including damages caps, had been in place for nearly 10 years in some states, the GAO found that in the period `from 1983 to 1985, total medical malpractice insurance costs for physicians and hospitals rose from $2.5 billion to $4.7 billion.' General Accounting Office, Medical Malpractice: Insurance Cost Increased but Varied Among Physicians and Hospitals, HRD-86-112, at 2 (September 1986) (`HRD-86-112'). (Emphasis added.) It noted that the increase in the cost of malpractice insurance to health care providers greatly exceeded the `change in either the consumer price index or the medical care index.' Id. at 2-3. The GAO could identify `no clear answer as to the causes of the increases in the cost of medical malpractice insurance.' General Accounting Office, Medical Malpractice: A Framework for Action, HRD-87-73, at 2 (May 1987) (`HRD-87-73'). Nor could it identify any `specific action ... that would guarantee that insurance rates [would] not continue to increase.' Id.

"At this point, it must be noted that the GAO study did not attempt specifically to assess the impact of damages caps on the cost or availability of malpractice insurance. Its primary value to our appraisal of the reasonableness of § 6-5-544(b) lies in the insight the study provides into the relative importance to the total cost of health care of the various components of the total implicated by the statute.
"In that connection, the GAO noted that the cost of malpractice insurance was the product of a number of elements and that the size and frequency of claims resulting from damages awards or settlements were only two of those elements. HRD-87-73, at 8. Other elements influencing the cost of malpractice insurance included `administrative expenses, marketing costs, investment income, taxes, profits, extent of state regulation, and amount of competition in the market.' Id. at 31. The study also cited the `availability of reinsurance, [and the] extent of competition in the market' as contributing factors. General Accounting Office, Medical Malpractice: Six-State Case Study Shows Claims and Insurance Costs Still Rise Despite Reforms, HRD-87-21, at 9 (December 1986) (`HRD-87-21').
"Not only does it appear that the element of damages awards composes but a fraction of the cost of malpractice insurance, but the study also revealed that malpractice insurance costs made up only 9 percent of the `total professional expenses' for self-employed physicians. HRD-86-112, at 3. `Nonphysician payroll,' composing 33 percent of total expenses, ranked at the top of the list. `Office expense' and `medical supplies' ranked behind payroll at 26 and 11 percent of total expenses respectively. Only `medical equipment' ranked below malpractice insurance costs, at 6 percent of total professional expenses. Id. at 4. Indeed, the study revealed that despite the increase in cost of malpractice insurance between 1983 and 1985, `total physician premiums,' as of September 1986, `still [composed] less than 1 percent of the country's total health care costs' based on the 1984 figure of approximately $390 billion. Id. at 25.
"Other studies addressing the effects of the `tort reform' of the mid-1970's have largely corroborated the GAO's conclusions. One study concluded that damages caps could reduce the number and size of claims paid out as a result of settlements or damages awards. P. Danzon, The Effects of Tort Reforms on the Frequency and Severity of Medical Malpractice Claims, 48 Ohio State L.J. 413, 416 (1987). The author noted, however, that her studies did not address the `effect of tort reforms on malpractice insurance rates.' Id. at 417. (Emphasis added [in Moore].)
*1341 "Another study attempted to establish a correlation between various approaches to tort reform and the price of malpractice insurance; nevertheless, the author noted: `To date, no one has isolated the effects of specific legislative actions on either the price or availability of malpractice insurance.' F. Sloan, State Responses to the Medical Malpractice Insurance `Crisis' of the 1970's: An Empirical Assessment, 9 J.Health Politics, Policy, and Law 629, 630 (1985). The author concluded:
"`Whereas many of the potential sources of premium inflation are national in scope, deliberate action has been undertaken mostly at the state level. The empirical results of the study presented here give no indication that individual state legislative actions, or actions taken collectively, have had their intended effects on premiums. [Emphasis added in Moore.] The publicity resulting from considerable legislative activity may have made juries and perhaps potential plaintiffs more aware of the cost consequences of malpractice suits. If so, this effect probably extended beyond the boundaries of any particular state.
"`Another possibility is that past frequency of claims and size distribution of settlements in a state are only weakly related to premiums in the state. [Emphasis added in Moore.] Premiums are set on the basis of expected outlays, and insurers may not have based their expectations for the future on past experience. Unfortunately, state-specific data on claims frequency and dollar amounts of settlements are not available for 1974 and thereafter. However, correlations among 1974 premiums, claims filed, cases won by plaintiffs, and mean size of awards for 1970 are surprisingly low (0.3 or less). Certainly, adverse insurer experience in a given year should be reflected in higher premiums in later years, so that higher correlations were anticipated. There is a need for more "hard" empirical evidence on how insurers really [emphasis in original] form expectations and set premiums.'
"Id. at 643 (footnotes omitted). See generally P. Zwier and D. Piermattei, Who Knows Best About Damages: A Case for Courts' Rights, 93 Dick.L.Rev. 689 (1989).
"In considering the evidence presented in these studies, we do not review the wisdom of the legislation challenged in this case. See Lankford v. Sullivan, Long & Hagerty, 416 So.2d 996, 1000 (Ala.1982). We consider it only in our assessment of the juxtaposition of the $400,000 cap to the goal of reducing the cost of health care based on information that was available to the legislature in 1987. To permit the legislature to act as the sole arbiter of such juxtaposition, would be to vacate our judicial role. Brannigan v. Usitalo, 134 N.H. 50, 587 A.2d 1232 (1991); Lucas v. United States, 757 S.W.2d 687, 691 (Tex.1988).
"We conclude that the correlation between the damages cap imposed by § 6-5-544(b) and the reduction of health care costs to the citizens of Alabama is, at best, indirect and remote. Although there is evidence of a connection between damages caps and the size of malpractice claims filed, the size of claims is merely one among a host of factors bearing on the cost of malpractice insurance. HRD-87-73, supra, at 8, 31. Even more significantly, the cost of malpractice insurance ranks near the bottom of the list of expenses incurred by health care providers. HRD-86-112, supra, at 3-4. Consequently, the size of claims against health care providers represents but one among many elements composing the cost of malpractice premiums, which, in turn, represent only a small component of the total burden borne by health care consumers. Id. at 25."
592 So.2d at 167-69 (footnote omitted).
On the basis of this extensive statistical analysis, the plurality concluded that the connection between the benefit sought from § 6-5-544(b) and the means used to obtain it was too "indirect and speculative" to support the classifications created. Id. at 170. In so concluding, it emphasized the fact that the individuals most benefited by the statute *1342 were the medical malefactors "who [were] most irresponsible." Id. (emphasis in original).
The plurality's statistical analysis of § 6-5-544(b), which section formed part and parcel of the same "tort reform package" as § 6-5-547, is equally applicable to this case, as are its conclusions regarding the inherent inequities of the damages cap. Indeed, the classifications created by § 6-5-547 are singularly bizarre and anomalous in view of the particular right of action to which the statute applies.
Section 6-5-547, in limiting recovery in certain wrongful death actions to $1,000,000, places a specific value on human life. Such a result represents a fundamental departure from the law and policy of this state as it has existed since 1877. See Atkins v. Lee, 603 So.2d 937 (Ala.1992); Central Alabama Electric Co-op v. Tapley, 546 So.2d 371 (Ala. 1989); Estes Health Care Centers, Inc. v. Bannerman, 411 So.2d 109 (Ala.1982); see also South & North Alabama R.R. v. Sullivan, 59 Ala. 272 (1877); Savannah & M.R. Co. v. Shearer, 58 Ala. 672 (1877). Far more troubling, however, is the fact that it assigns this value to one isolated class of Alabama citizens, namely, the victims of fatal medical malpractice.
The notion that the lives of some of Alabama's citizens are worth less than the lives of others is an idea that carries the gravest of implications. We can conceive of nothing but the most compelling of circumstances that could justify the consequences of such a classification, with its attendant burden on the fundamental liberty interest of our people. Nothing but the strongest possible connection between the benefit sought and the means used to obtain it could justify such an odious burden on the fundamental liberty interest discussed abovewhich interest accrues to all Alabama citizens equally. This case involves neither the circumstances nor the necessary connection. Therefore, we hold that § 6-5-547 violates the equal protection guarantee of the Constitution of Alabama.

B. Jury Trial
Smith also contends that § 6-5-547 violates Ala. Const. 1901, § 11, which provides: "That the right to trial by jury shall remain inviolate." In support of this contention, he relies, again, on Moore, in which this Court held that § 6-5-544(b) violated § 11, and, additionally, on Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), in which we held that § 6-11-21, which "limit[ed] to $250,000 jury awards of punitive damages," id. at 880, violated the right to a jury trial as guaranteed by § 11. Id. at 894. Dr. Schulte and PAM point out a distinction between the statute invalidated in Henderson and the statute under review in this case, namely, that the cause of action affected by § 6-11-21 was of common law origin, while the cause of action affected by § 6-5-547 is of statutory origin.
It is well settled in Alabama that § 11 governs (1) those causes of action arising under the common law, and (2) those causes of action afforded by pre-1901 statutes. This principle was never more forcefully stated than in Gilbreath v. Wallace, 292 Ala. 267, 270, 292 So.2d 651, 653 (1974), where the Court declared: "Alabama's Constitution effected a `freezing' of the right to jury trial as of 1901." 292 Ala. at 269, 292 So.2d at 652. See also Alford v. State ex rel. Attorney General, 170 Ala. 178, 188-89, 54 So. 213, 215-16 (1910) (Mayfield, J., dissenting); Tims v. State, 26 Ala. 165 (1855).
The fact that Gilbreath involved the power of the legislature to change the numerical composition of juries in will contests, rather than an issue more closely analogous to a damages cap, is not significant. Significant is the fact that it reaffirmed an important principle of general application, and that this Court has never abandoned that principle.
In particular, Ex parte Giles, 632 So.2d 577 (Ala.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994), did notthe defendants' arguments notwithstandingretreat from this principle. To be sure, Giles held that § 11 did not prevent the *1343 trial judge in a capital murder trial, based on former Ala.Code 1975, §§ 13-11-1 to -8, from overriding a jury's sentencing recommendation, even though the murder statutes existing in 1901 did not provide for such an override. 632 So.2d at 583. In so holding, however, this Court was careful not to overrule, expressly or implicitly, the relevant aspect of Gilbreath. On the contrary, in an extended discussion, we set forth a number of reasons why the particular sentencing procedure was not governed by the Gilbreath rule. Ex parte Giles, 632 So.2d at 580-83.[5] Had we intended to abrogate that rule, the short answer to Giles's challenge would have been to reject it forthrightly, briefly stating: "We hereby overrule Gilbreath to the extent it holds that § 11 freezes the right to a trial by jury as it existed by statute in 1901." Apparent, therefore, from a thorough reading of Ex parte Giles is the fact that this Court did not, as the defendants contend and as Justice Houston's dissent suggests, overrule that basic Gilbreath principle.
Also significant is the fact that the principle applies to the right of trial by jury insofar as it includes the right to have the jury determine the amount of damages. Henderson, supra; Moore, supra. Indeed, damages assessment epitomizes the jury's function as a factfinder. See Moore, 592 So.2d at 164 ("practical effect of the damages limitation ... is to prevent the jury from applying the facts") (emphasis in original); Clark v. Container Corp. of America, Inc., 589 So.2d 184, 195 (Ala.1991) (provision prohibiting the jury from "`reduc[ing] any future damages to present value'" usurps its "factfinding function") (principal opinion by Houston, J., with one Justice concurring and five Justices concurring in the result).
Because Ala.Code 1896, §§ 26 and 27which differed in no relevant respect from their successors, §§ 6-5-391 and -410, Ala.Code 1975, the current version of the Wrongful Death Actafforded personal representatives the right to "such damages as the jury may assess," that right was "frozen" by the ratification of the Constitution of 1901. In other words, the ratification of this present constitution removed from the legislature the power to abrogate the jury's fundamental factfinding role in wrongful death cases. But that is precisely what the legislation under review purports to do.
Thus, in imposing, regardless of the facts in each case, an absolute limitation on the amount of damages the jury may assess, § 6-5-547 operates precisely like the sections invalidated in Moore and Henderson, specifically, it inhibits the jury in the most fundamental aspect of its function. The conclusion is inevitable, therefore, that § 6-5-547 violates the right to trial by jury as guaranteed by § 11 of the Constitution of Alabama.
This conclusion is not inconsistent with Garner v. Covington County, 624 So.2d 1346 (Ala.1993), another case on which the defendants rely. In that case, the Court held that Ala.Code 1975, § 11-93-2, which limited to $100,000 jury awards of damages against "governmental entitit[ies]," did not violate § 11. 624 So.2d at 1354. The holding in Garner rested on the "unique status of counties and cities as governmental entities." Id. at 1351. "Because they are creations of the sovereign, the State of Alabama, and because they exercise certain governmental functions that are dependent upon tax dollars," the Court explained, "actions against them have always been subject to reasonable regulation by the legislature on a basis not applicable to actions against individuals and other entities." Id.
The distinction between the entities subject to § 11-93-2 and those subject to § 6-5-547 *1344 renders these respective statutes so fundamentally distinguishable as to eliminate the need for further elaboration. Suffice it to say, as did the trial judge: "The defendants in the case at bar do not enjoy the unique status of counties or cities; and, therefore, no such status, crucial to the rationale of Garner, supports the constitutionality of the § 6-5-547 cap on any wrongful death judgment against medical providers." C.R. 1055.
Our conclusions in Case Number 1930362 are, therefore, that § 6-5-547 violates the constitutional provisions guaranteeing (1) the equal protection of the laws and (2) the right to trial by jury. Consequently, the judgment of the trial court, to the extent it applied the damages limitation contained in the statute, is reversed.

II. Case Number 1930459
In their cross appeal, Dr. Schulte and PAM do not challenge the judgment on the grounds of sufficiency or weight of the evidence supporting the verdict. They contend only that the amount of the verdict was excessive. In its order following the Hammond/Green Oil hearing, the trial court, before addressing the constitutionality of the damages cap, considered whether a remittitur was warranted, and it concluded that the verdict of $4,500,000 was not excessive.
In Duck Head Apparel Co. v. Hoots, 659 So.2d 897 (Ala.1995), this Court, quoting the trial court's Hammond/Green Oil order in that case, set forth the following list of factors relevant to the question whether a punitive damages verdict is excessive, generally:
"`(1) Culpability of defendant's conduct.
"`(2) Desirability of discouraging others.
"`(3) Impact on the parties.
"`(4) Impact on innocent third parties.
"`(5) Relationship between actual [or] potential harm and the amount of the verdict.
"`(6) Degree of reprehensibility of defendant's misconduct, including duration, defendant's awareness, harm caused or likely to be caused by defendant's conduct and any concealment or cover-up.
"`(7) Whether defendant profited from its activities.
"`(8) Financial position of defendant.
"`(9) Costs of litigation.
"`(10) Criminal sanctions.
"`(11) Other civil actions.
"`(12) Availability of liability insurance.
"`(13) Comparative analysis of similar cases.
"`(14) Actual/compensatory damages awarded.
"`(15) Efforts by defendant to remedy the wrong and the opportunity or lack of opportunity that plaintiff gave defendant to remedy the wrong."
659 So.2d at 909-910. Although we have considered all of those factors that are relevant to this case, several of them warrant particular discussion.

A. Harm Threatened by the Defendants' Conduct
This factor weighs in favor of an award of substantial punitive damages. It was well established at trialindeed, concededthat the administration of Pavulon to a patient during intubation renders the patient incapable, not only of respiration, but also of speech. A patient thus paralyzed is conscious of her surroundings, but must depend entirelyand silentlyupon her attendants for her oxygen supply. Dr. Schulte conceded that in such a case the failure of attendants timely to ascertain the location in the body of the endotracheal tube would, if it had entered the stomach, result in a rapid deterioration of the patient's condition, progressing from cardiac arrest, through irreversible brain damage, to death. He also testified that placement confirmation is properly accomplished by listening to the intubated patient's lungs and stomach with a stethoscope, but conceded that he did not listen in *1345 this manner, or direct any of the five medical personnel assisting him to do so, before Mrs. Smith lost her blood pressure and suffered a cardiac arrest.
Failing timely to discover the improper placement of an endotracheal tube in a paralyzed patient imports to a physician the probability of the gravest of consequences. In such cases death, or at least severe brain damage, is virtually certain. Moreover, the trauma suffered by a patient who, conscious of her surroundings, knows that she is dying of suffocation, but, because of the paralyzing drug, is unable to communicate her distress, will be extreme. Substantial damages are necessary to punish and deter substandard behavior attended by such severe consequences of which a physician is necessarily aware.
These considerations support the amount of the verdict returned in this case. They must, however, be weighed against the following countervailing factors.

B. Attempts at Concealment or Cover-up
Within three hours of the procedure, Dr. Schulte told Mr. Smith that he had misplaced the endotracheal tube and that he had failed to discover the error for several minutes. The following day, he repeated this account to Mr. Smith and to Mr. Smith's daughter. Moreover, Dr. Schulte expressly noted the misplacement of the endotracheal tube on Mrs. Smith's medical chart.
Without doubt, these admissions facilitated Smith's discovery of a cause of action and the prosecution of his case against Dr. Schulte and PAM. In view of the respiratory complications Mrs. Smith was experiencing independent of the intubation episode, the autopsy reportreferring only generally to oxygen deprivationdid not, of itself, afford a firm basis for a cause of action. Thus, had Dr. Schulte been less candid, the Smiths, and, ultimately, the jury, may never have learned of the distinct period of oxygen deprivation made the basis of this action.
Such candor should be encouraged by affording it considerable weight in the overall punitive damages analysis. We, therefore, consider Dr. Schulte's admissions to the Smiths and notations in the medical chart a significant countervailing factor.

C. Financial Impact of the Verdict
Regarding the defendants' financial positions, the trial court made the following findings:
"Defendants each have $1,000,000 in liability insurance with Mutual Assurance for a total of $2 million in insurance. Dr. Schulte has $438,600 in personal assets (excluding the $245,000 in debt on his two houses) and earned $127,158 in adjusted gross income in 1988, $174,330 in adjusted gross income in 1989, $354,877 in adjusted gross income in 1990, $395,627 in adjusted gross income in 1991, and $377,173 in adjusted gross income in 1992.
"Pulmonary Associates of Mobile had a net Stockholders' Equity of $147,003.06 at the end of its fiscal year on September 30, 1992, had physical assets which cost $597,059 and had a net book value of $159,650.02 on September 30, 1993, and had accounts receivable of `approximately a couple of a million dollars,' which have an historic collectability factor of 68%. Since the time its last financial statements were created, Pulmonary Associates purchased a computer system which cost in excess of $80,000.... There are four equal shareholders in the group, Drs. Schulte, McAtee, Saucier and Gottlieb. For the fiscal year ending September 30, 1992, Pulmonary Associates' gross collections were $3,802,616."
(Citations omitted.)
Based on these figures, the trial court predicted that Dr. Schulte and PAM would be able to "survive the verdict ... by applying existing assets and a part of future income." (Emphasis added.) The defendants dispute this prediction, contending that the imposition of the $4,500,000 verdict would "destroy" their practice. Brief of Appellees/Cross Appellants, at 43.
*1346 The defendants' contention merits careful consideration. The $2.5 million remaining of the verdict after deduction of $2 million, the aggregate amount of insurance carried by the defendants, would entirely obliterate PAM's accounts receivables for nearly two full years [68% of $2 million (collection rate) equals $1,360,000 (accounts receivable for one year), minus $2.5 million equals -$1,140,000]. The sum of the remainder of the defendants' aggregate assets also compares unfavorably to the portion of the verdict exceeding the amount of insurance. Regardless of whether the defendants could, as the trial court predicted, "survive" the verdict, the execution of a judgment on the full amount of the award would impose a crushing burden on the defendants' practice.
To accomplish its purpose, the amount of a punitive damages award "should be enough to punish the defendant and vindicate the public's right to be free of the kind of conduct of which the jury has found the defendant guilty, but [it] should not be so much as would financially destroy him." Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878, 885 (Ala.1991) (emphasis added). The verdict awarded in this case would come perilously close to financially destroying the defendants.
In summary, consideration of all the factors relevant in a Hammond/ Green Oil analysis compels the conclusion that this punitive damages verdict was excessive and must be reduced by $2,000,000. Consequently, the ruling of the trial court at issue in Case Number 1930362 is reversed. As to Case Number 1930459, the judgment is affirmed, conditioned upon Smith's acceptance within 28 days of a remittitur of $2,000,000, resulting in a judgment for Smith in the amount of $2,500,000.[6]
1930362REVERSED.
1930459AFFIRMED CONDITIONALLY.
SHORES and INGRAM, JJ., concur.
KENNEDY, J., concurs specially.
ALMON, J., concurs in part and concurs in the result in part.
COOK, J., concurs except as to Part I.B.
BUTTS, J., concurs in the result.
MADDOX and HOUSTON, JJ., dissent.
KENNEDY, Justice (concurring specially).
I concur specially in order to address Justice Houston's comments in his dissenting opinion.
I think it would come as quite a shock to Alabamians to learn that they have no right of equal protection under the Alabama Constitution. That proposition is the basic premise of the dissent. They should be shocked, because that proposition is simply not so. Indeed, in Ex Parte Caffie, 516 So.2d 831, 837 (Ala.1987), Justice Houston, writing for the Court, recognized the existence of an equal protection guarantee under the Constitution of Alabama. In Caffie, Justice Houston cited Ex parte Jackson, 516 So.2d 768 (Ala.1986), for the proposition that "state equal protection provisions afford protection against racially motivated peremptory strikes similar to that afforded by the federal constitution." 516 So.2d at 837. (Emphasis added.) Similarly, in Ex parte Southern Ry., 556 So.2d 1082 (Ala.1989), a majority of the Court, including Justice Houston, held, in pertinent part, that certain venue and jurisdiction laws affecting foreign corporations did not violate "the equal protection provisions of the constitution of the State of Alabama." 556 So.2d at 1091.
There is no ambiguity, for example, in these words from the very first section in our constitution: "That all men are equally free *1347 and independent."[7] See Art. I, § 1, Constitution of 1901. Absent ambiguity, the Court cannot look to dictionaries, previous constitutional provisions, or debates of a constitutional convention to obfuscate or alter the meaning of these words. As Justice Houston once quoted from The Rubáiyát of Omar Khayyám (4th ed. 1879):
"`The Moving Finger writes; and, having writ,
Moves on: nor all your Piety nor Wit
Shall lure it back to cancel half a Line,
Nor all your Tears wash out a Word of it.'"
Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 177 (Ala.1991) (Houston, J., disagreeing with the rationale but concurring in the result).
ALMON, Justice (concurring in part and concurring in the result in part).
I concur in Part I.B., holding that § 6-5-547 violates the right to trial by jury as guaranteed by § 11 of the Alabama Constitution, and I concur in Part II, affirming the judgment on condition of a remittitur. I concur only in the result of Part I.A., holding that § 6-5-547 violates the right to equal protection of the laws as guaranteed by the Alabama Constitution.
COOK, Justice (concurring except as to Part I.B.).
I concur in all respects with the majority opinion, except as to Part I.B., which holds that Ala.Code 1975, § 6-5-547, violates Ala. Const. 1901, § 11. Our holding, in Part I.A., that § 6-5-547, Ala.Code 1975, violates the equal protection guarantee of the Alabama Constitution, obviates discussion of § 11. Therefore, I do not join Part I.B., and I express no opinion as to whether § 6-5-547 violates the right to trial by jury.
MADDOX, Justice (dissenting).
Justice Houston, in his dissent, shows why he concludes that the framers of the Alabama Constitution in 1901 specifically omitted an "equal protection" clause from the Alabama Constitution. I believe that he is correct, because I have read the debates of the delegates to the 1901 Constitutional Convention on the question, and those debates show that a majority of the delegates did not want to include an equal protection clause in the Alabama Constitution. They specifically did not want to accord any further guarantee of equal protection than was given under the provisions of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.
The reasoned debate between the Justices of this Court on the question whether the Alabama Constitution has an "equal protection" clause would seem to be more academic than germane, except for the fact that this plaintiff has specifically framed the constitutional issue so as to assert his alleged equal protection rights under the Alabama Constitution and has strategically not asserted any violation of his federal constitutional rights, so as to prevent a review by the United States Supreme Court. He has every right to do this, but he must live with his choice.[8]
Justice Houston is absolutely correct in stating that this Court, when discussing the *1348 equal protection question posed in Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), did so by taking Sections 1, 6, and 22 of the Alabama Constitution and construing those Sections together with the Fourteenth Amendment to answer the constitutional issue there involved, the constitutionality of Alabama's so-called Guest Statute. Pickett v. Matthews was cited in Peddy v. Montgomery, 345 So.2d 631 (Ala.1977), as standing for the proposition that the Alabama Constitution contained an "equal protection" clause, but, as Justice Houston correctly points out, that was an incorrect reading of Pickett v. Matthews.
HOUSTON, Justice (dissenting).
I address Justice Kennedy's special writing before I address the majority opinion.
While doing legal research to vote on Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991), I found that the equal protection clause that had appeared in the 1868 and 1875 Alabama Constitutions had been deleted from the Constitution of Alabama of 1901. I further found that this Court had acknowledged that in Opinion of the Justices No. 102, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949):
"We point out that there is no equal protection clause in the Constitution of 1901. The equal protection clause of the Constitution of 1875 was dropped from the Constitution of 1901."
I read the minutes of the Constitutional Convention of 1901 and found that the delegates intended for there to be no equal protection clause in the Alabama Constitution. I read the 1977 case, Peddy v. Montgomery, 345 So.2d 631 (Ala.1977), the rock on which the concept of equal protection under the Alabama Constitution was founded. I then read Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), the case Peddy v. Montgomery had relied upon for the proposition that there was an equal protection clause in the Alabama Constitution. I realized that Peddy v. Montgomery had misquoted Pickett v. Matthews by leaving out the reference in Pickett to the Fourteenth Amendment to the United States Constitution as the source for equal protection in Alabama. I then read Art. I, §§ 1, 6, and 22, of the Alabama Constitution and realized that no clear, unambiguous language in these sections authorized this Court to strike down a duly enacted statute based upon an Alabama equal protection provision. To me, the word "free" has many meanings (for example, not a slave; not subject to arbitrary interference by a government; not detained by governmental officials); and the word "independent" has at least two meanings (self-reliant and free from control of another). To me, the phrase "equally free and independent" does not clearly and unambiguously mean that "all men" are entitled to "equal protection of the laws" (Fourteenth Amendment, United States Constitution) or possess "equal civil and political rights."[9] (Article I, § 2, Constitution of Alabama of 1875).
In my concurrence in the result in Moore v. Mobile Infirmary Ass'n, I wrote to this, because four Justices on the Court were purporting to strike down a tort reform statute dealing with compensatory damages in medical malpractice cases as unconstitutional under what I perceived to be a "phantom" equal protection clause of the Alabama Constitution; and I also did the appellate justices' mea culpa for my prior mistakes that Justice Kennedy alludes to:
"`As strongly as we believe in the stability of the law, we also recognize that there is merit, if not honor, in admitting prior mistakes and correcting them.'"
592 So.2d at 178, citing Jackson v. City of Florence, 294 Ala. 592, 598, 320 So.2d 68, 73 (1975).

I. Equal Protection under the Constitution of Alabama of 1901.

A.
The equal protection challenge in this case is based solely on whatever guarantee of *1349 equal protection may be afforded by the Constitution of Alabama of 1901. There is none. Alabama citizens are protected only by the equal protection provision in the Fourteenth Amendment to the United States Constitution. See Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995) (Houston, J., concurring in the result); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 174-78 (Ala. 1991) (Houston, J., disagreeing with the rationale of the Court's opinion, but concurring in the result); Ex parte Bill Salter Advertising, 658 So.2d 451 (Ala.1995) (Houston, J., concurring specially); Ex parte St. Vincent's Hospital, 652 So.2d 225, 230-31 (Ala.1994) (Houston, J., concurring specially); City of Birmingham v. Davis, 613 So.2d 1222, 1225 (Ala.1992) (Houston, J., concurring specially in the denial of rehearing); Ex parte Bunting Plastic Surgery Clinic, 624 So.2d 1075, 1076 (Ala.1993) (Houston, J., concurring specially); Ex parte Bronner, 623 So.2d 296, 300 (Ala.1993) (Houston, J., concurring in the result); Jordan v. Reliable Life Insurance Co., 589 So.2d 699, 703 (Ala.1991) (Houston, J., concurring specially).
Erroneous interpretations of judicial decisions or of statutes can become precedent, and when they do they are followed under the doctrine of stare decisis. However, the separation of powers provisions of the Constitution of 1901 (Art. III, §§ 42, 43) will not permit this Court to strike down a statute, duly enacted by the legislature, by use of a nonexistent constitutional right created only by judicial error.

B.
Even if I thought there was an equal protection provision in the Constitution of Alabama of 1901, I would hold that the statute in question does not violate such a provision. Reese v. Rankin Fite Memorial Hospital, 403 So.2d 158 (Ala.1981).
The first task for any court assessing the constitutionality of a statute under any equal protection challenge is to determine the proper standard of scrutiny to be applied. While the per curiam opinion repeats the often-heard claim that equal protection analysis under the Alabama Constitution's phantom equal protection clause "does not parallel... an analysis based on the Equal Protection Clause of the Fourteenth Amendment," Alabama state equal protection case law has somehow developed into a three-tiered analysis remarkably similar to the analysis under Federal equal protection law. Choosing to completely ignore earlier cases such as Reese v. Rankin Fite Memorial Hospital, supra, this Court has created this three-tiered system, while refusing to acknowledge its existence or to clearly delineate when and where these different tests apply. This body of case law has created a legal and analytical quagmire and has given this Court almost limitless discretion in striking down duly enacted laws. See Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 170 (Ala.1991).
The highest level of scrutiny applied in equal protection analysis is "strict scrutiny." This Court, in the case of Indian Rivers Community Health Center v. City of Tuscaloosa, 443 So.2d 894 (Ala.1983), held that if a statutory classification adversely affects a suspect class or abridges a fundamental right, then the proper constitutional standard to be applied is the "strict scrutiny" test, which requires that the challenged law be narrowly tailored to the furtherance of a compelling governmental interest in order for the law to be upheld. Id. at 896. The lowest level of equal protection scrutiny is "rational basis" scrutiny. The case of Reese v. Rankin Fite Memorial Hospital, supra, sets out Alabama's version of rational basis scrutiny, stating that, for a statute "[t]o withstand an equal protection challenge, the Court need only find that the classification made by the legislature is not arbitrary or unreasonable." 403 So.2d at 161.
By the application of language from a substantive due process case (Mount Royal Towers, Inc. v. Alabama Board of Health, 388 So.2d 1209 (Ala.1980)), this Court has also developed an intermediate level of equal protection scrutiny. In Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 166 (Ala.1991), in applying state equal protection analysis to *1350 determine the constitutionality of a tort reform statute capping noneconomic compensatory damages in medical malpractice cases, the Court held as follows:
"[W]hether the classifications created under § 6-5-544(b) represent a reasonable exercise of legislative power depends on whether they are reasonably related to the stated objective, and whether the benefit bestowed upon society outweighs the detriment to private rights occasioned by the statute. Mount Royal Towers, Inc. v. Alabama Bd. of Health, [supra]...."
(Emphasis added.) The case on which the majority opinion in Mobile Infirmary had been based, in applying substantive due process, not equal protection analysis, held that "where legislation affects protected economic interests or liberties, it must be tested against the public purpose sought to be served, and there must be a legitimate bona fide relationship between a permissible public purpose and legislation passed to further that end." Mount Royal Towers, Inc. v. Alabama Bd. of Health, 388 So.2d at 1214 (emphasis added).
In applying the various lines of cases to the present case, it is obvious that the only applicable standard is the Reese rational basis test. Because the statute in question does not adversely affect a suspect class[10] and does not abridge any fundamental right, no credible argument can be made for the application of strict scrutiny to that statute. The case of Breed v. Atlanta B. & C.R.R., 241 Ala. 640, 4 So.2d 315 (1941), held that a criminal conviction and sentence of life imprisonment did not deprive a defendant of his "natural right to life" and, therefore, that the family of such a person could sue for wrongful death under Alabama's statute. 241 Ala. at 642, 4 So.2d at 316. It did not hold that "citizens enjoy a fundamental right not to be deprived of liberty and life as a consequence of fatal malpractice," as this Court today incredibly suggests, 671 So.2d at 1338 (emphasis omitted). Fundamental rights exist only to protect citizens against intentional deprivations of liberty or legitimate property interests by the government. Laurence H. Tribe, American Constitutional Law, § 16-8, page 1455 (1988). No one has a fundamental right not to be injured by a fellow private citizen. Persons injured by private citizens must look to state tort law for redress, not to state constitutional law. The question here then is whether any governmental action has deprived the plaintiff of his "natural right to life."
Wrongful death statutes come into play only after a death has occurred. Wrongful death statutes, like many other laws and regulations, seek to preserve "life [through the] prevention of its destruction by the wrongful acts or omission of another." Breed v. Atlanta B. & C.R.R., 241 Ala. at 642, 4 So.2d at 316-17. How can anyone truly argue that by capping wrongful death damages at $1,000,000 plus annual C.P.I adjustments, the State has deprived anyone of his or her life? The connection between any lessening of the wrongful death statute's deterrent effect and the loss of any individual's life is too attenuated. The present Court's logic could just as easily be applied to a bill raising the speed limit or to the easing of a governmental regulation controlling the use of pesticides on fruit.[11] Any of these actions can be argued statistically to contribute to the death of some small number of persons over a number of years. Furthermore, in terms of actual deterrence, are not criminal laws dealing with involuntary manslaughter and vehicular homicide much greater deterrents *1351 to the taking of others' lives?[12] Using the majority's logic, one must ask whether this Court will have to strike down any law that reduces even slightly the jail terms mandated for such crimes?
Numerous courts, both federal and state, have rejected the argument that there is a fundamental right to recover damages in wrongful death actions. A number of these cases dealt with equal protection challenges to the total prohibition of punitive damages recoveries in wrongful death actions based on both the federal and respective state equal protection guarantees.[13] Other cases have rejected the same fundamental rights argument in the context of limiting the amount of recovery.[14]
Neither is there any merit in this Court's argument that the statute seeks to deprive anyone of any property interest. The majority writes that "[t]he notion that the lives of some of Alabama's citizens are worth less than the lives of others is an idea that carries the gravest of implications." 671 So.2d at 1342 (emphasis original). The majority seems to forget that this Court has interpreted Alabama's Wrongful Death Statute as allowing the recovery of only punitive damages.[15] See, e.g., Killough v. Jahandarfard, 578 So.2d 1041, 1044 (Ala.1991). Therefore, Alabama's Wrongful Death Statute does not value life; it, like a host of other regulatory devices, seeks to punish culpable conduct and therefore to "stimulate diligence and check violence, in order thereby to give greater security to human life." Breed v. Atlanta B. & C.R.R., 241 Ala. at 642, 4 So.2d at 316. The Breed Court further held:
"The right of action which the statute gives is a new right, not derivative nor the right of succession to the person slain. It is not a right of property, and the personal representative in bringing and prosecuting the suit acts as an agent of legislative appointment for the effectuation of the public policy it declaresthe prevention of homicides."
241 Ala. at 642, 4 So.2d at 317. (Emphasis added.) (Citations omitted.) Not only does the nature of Alabama's wrongful death recovery further weaken any argument that the classification abridges a fundamental right, it also disposes of any argument for the application of the Mobile Infirmary intermediate scrutiny standard.
The application of this intermediate level of scrutiny depends on a finding that the challenged classification "affects protected economic interests or liberties." Mount Royal Towers v. Alabama Bd. of Health, 388 So.2d 1209, 1214 (Ala.1980). Because, as the Breed decision clearly holds, there is "not a right of property" in the recovery of wrongful death damages in Alabama, there are no "private rights" to be balanced against the "benefit sought to be bestowed upon society," as required for the application of the Mobile Infirmary intermediate level of equal protection scrutiny. Moore v. Mobile Infirmary Ass'n, 592 So.2d at 166. Because neither Alabama's line of equal protection cases applying a fundamental rights analysis nor its cases applying intermediate level scrutiny apply to the present case, the proper standard of equal protection scrutiny is rationality *1352 scrutiny as defined and applied by Reese v. Rankin Fite Memorial Hospital, 403 So.2d 158 (Ala.1981), and its progeny.
Reese v. Rankin Fite Memorial Hospital, 403 So.2d at 160-62, involved a statute enacted as part of the Medical Liability Act. This statute was challenged as violating equal protection provisions of the Alabama Constitution and the United States Constitution. Justices Maddox, Almon, and Shores, the only present members of the Court who were Justices at that time, concurred in the per curiam opinion, which held:
"To withstand an equal protection challenge, the Court need only find that the classification made by the legislature is not arbitrary or unreasonable. As this Court recently held in Tyson v. Johns-Manville Sales Corporation, 399 So.2d 263 (Ala. 1981):
"`A statutory discrimination between classes is held to be relevant to a permissible legislative purpose if any state of facts reasonably may be conceived to justify it.'
"The Medical Liability Act was the legislature's response to a crisis which developed nationwide in the 1970's. We cannot say that the equal protection provisions of the Constitution restrict its authority to withdraw the legislative grace given minors in § 6-2-8 in the field of medical malpractice claims.
"....
"We hold that the Medical Liability Act does not offend either the due process or the equal protection provisions of the state or federal [constitution]."
403 So.2d at 161-62.
This case and the cases following it (see, e.g., Ex parte DeMent, 424 So.2d 659, 661 (Ala.1982); Bowlin Horn v. Citizens Hospital, 425 So.2d 1065, 1072-73 (Ala.1982); Home Indemnity Co. v. Anders, 459 So.2d 836, 840-41 (Ala.1984)) have not been expressly overruled by the majority opinion; however, there is no way to reconcile the legal reasoning and the results reached in those cases with the majority opinion in this case.
In Ralph D. Gaines, Jr., and William K. Hancock, Tort Reform in Alabama: A Proponent's Perspective, 18 Cumb.L.Rev. 649, 661-62 (1988), the following appears:
"Regarding an equal protection challenge to the disparate definitions, an analogy can be drawn to legislation that abolishes the collateral source rule only for actions against health care providers. The Medical Liability Act's definition applies equally to all the members of the class affected. Therefore, no member of the class is deprived of the protection of the law extended to other members of the class.
"Alabama case law resolves the equal protection issue. In Reese v. Rankin Fite Memorial Hospital, the Alabama Supreme Court held that legislation providing for a different statute of limitations for minors injured through medical malpractice did not violate the equal protection right of the minors. Provided that such legislation does not create a suspect classification, it survives equal protection scrutiny so long as the legislation is not found to be arbitrary or unreasonable. [Ala.Code 1975, § 6-5-540.] This statement indicates that the legislature sought to ameliorate a perceived diminution in the availability of adequate health care. Certainly, this goal is not unreasonable. The substantial evidence definition might further that legislative goal by reducing the cost of medical insurance, thereby reducing the cost of health care for Alabamians."

II. Denial of Right to Trial by Jury

"We are often most in the dark when we are most certain, and the most enlightened when we are the most confused."
Dr. M. Scott Peck, The Road Less Traveled 285 (Simon & Schuster, 1978).
If Dr. Peck is correct, then for me, enlightenment hath wrought its masterpiece, for *1353 never have I been so confused as to what violates Article I, § 11, of the Constitution of Alabama of 1901.
During oral argument, Smith's attorney conceded that a wrongful death action is purely statutory and is not recognized by the common law as being among its old and settled proceedings. The Alabama Wrongful Death Statute was enacted after Alabama's first constitution was adopted, but before the ratification of the 1901 Constitution. Therefore, by the authority of Ex parte Giles, 632 So.2d 577, 580-81 (Ala.1993), this Court should hold that § 6-5-547 does not violate § 11.
In Gilbreath v. Wallace, 292 Ala. 267, 270, 292 So.2d 651, 653 (1974), this Court declared: "Alabama's Constitution effected a `freezing' of the right to jury trial as of 1901."
"When the Constitution of 1901 was ratified, the power was expressly conferred in juries to impose the sentence of death or life imprisonment for defendants found guilty of murder in the first degree (Ala. Code 1897, § 4858); to impose the term of imprisonment for defendants found guilty of murder in the second degree (§ 4858), manslaughter (§ 4862), rape (§ 5444), robbery (§ 5479), and other offenses (§§ 5050, 4420, 4758); and to fix and determine the amount of the fine that a convicted felon had to pay (§ 5415). Section 1205 of Act No. 607, Acts of Alabama 1977 (now codified at Ala.Code 1975, §§ 13A-5-1 through 13A-5-59), removed from the jury the right to sentence and to fix and determine the amount of fines."
Henderson v. Alabama Power Co., 627 So.2d 878, 905 (Ala.1993) (Houston, J., dissenting).
Thus, the right of a jury to sentence in a criminal case and the right to have a jury award damages in a civil wrongful death case were not in existence when the first Alabama Constitution was adopted, but did exist at the time of the ratification of the 1901 Constitution.
In Gilbreath, this Court wrote:
"In Alford v. State [ex rel. Attorney General, 170 Ala. 178, 54 So. 213 (1910) ], the court quoted from Tims v. State, [26 Ala. 165 (1855) ], and set forth the principle as it applies to both civil and criminal cases:

"`The right [trial by jury] is confined to those classes of cases in which the right existed at common law, or in which it was used at the time of the adoption of the Constitution. Where there have been several Constitutions, the right is in reference to its existence at the time of the adoption of the last one.'"
292 Ala. at 270, 292 So.2d at 653. (Emphasis added.)
I cannot follow the reasoning of the majority opinion in Giles, unless it adopted what it quoted, apparently with approval, from Crowe v. State, 485 So.2d 351, 364 (Ala.Crim. App.1984), rev'd on other grounds, Ex parte Crowe, 485 So.2d 373 (Ala.1985):
"We must agree with the above authorities and hold that Article I, Section 11, confers the right of trial by jury as existed at common law and the time of Alabama's first state constitution. This provision did not incorporate the statutes conferring sentencing authority upon the jury which were in force at the time of the adoption of the 1901 Alabama Constitution."
Ex parte Giles, 632 So.2d at 580. (Emphasis added.)
What, pray tell, did Giles do if it did not overrule Gilbreath, at least as it applied to criminal law? "[W]e reaffirm the principle that, in Alabama, the `judge, and not the jury, is the final sentencing authority in criminal proceedings.'" 632 So.2d at 583. Because the jury had sentencing authority when the Constitution of 1901 was ratified, this overruled Gilbreath as effectively as the suggested sentence in the majority opinion in the present case: "Had we intended to abrogate that rule, the short answer to Giles's challenge would have been to reject it forthrightly, briefly stating: `We hereby overrule Gilbreath to the extent it holds that § 11 freezes the right to a trial by jury as it *1354 existed by statute in 1901.'" 671 So.2d at 1343 (emphasis original).
In Giles, 12 jurors did not unanimously sentence Giles to death. In 1901 in Alabama, jurors imposed sentences in capital cases. Traditionally, § 11 of the Constitution ("[t]hat the right to trial by jury shall remain inviolate") restricted the legislature and the courts (not only does § 11 restrict courts, but § 6.11 of Amendment No. 328 also restricts the courts) from attempting to change the number of jurors, the impartiality of jurors, and the unanimity of jurors. Kirk v. State, 247 Ala. 43, 22 So.2d 431 (1945); Baader v. State, 201 Ala. 76, 77 So. 370 (1917); Judge Walter B. Jones, Trial by Jury in Alabama, 8 Ala.L.Rev. 274, 277 (1956). In Giles, the majority of this Court changed the requirement that a jury's verdict be unanimous in a situation in which a unanimous jury verdict would have been required at the time of the ratification of the 1901 Constitution, by using much rhetoric and little reason.
Ex parte Giles, 632 So.2d 577, 583 (Ala. 1993), overruled Gilbreath v. Wallace as it applied to criminal law by holding: "[W]e reaffirm the principle that, in Alabama, the `judge, and not the jury, is the final sentencing authority in criminal proceedings.'"
In the majority opinion in the present case, the following sentence appears: "Apparent, therefore, from a thorough reading of Ex parte Giles is the fact that this Court did not, as the defendants contend and as Justice Houston's dissent suggests, overrule that basic Gilbreath principle." 671 So.2d at 1343.
If that statement in the majority opinion is correct, then I am confused (enlightened per Dr. Peck) as to why today's judgment by the majority of this Court does not violate the equal protection rights under the Fourteenth Amendment to the United States Constitution (which are the only legitimate equal protection rights guaranteed to Alabamians) and the due process guarantees under both the United States and Alabama Constitutions of either Arthur Lee Giles and other criminal defendants or Dr. Schulte and other civil defendants, who rely on Alabama Tort Reform legislation. If a double standard has not been created, then the majority of this Court has returned to a pre-Giles interpretation of Gilbreath v. Wallace, having paused long enough to carve out a single exception to the rule stated in Gilbreath v. Wallace for the purpose of upholding Giles's death sentence.
My confusion (enlightenment) concerns what is going to happen in future capital cases in which a jury does not unanimously sentence to death but the trial court does sentence to death (which is permissible under Alabama law, assuming that it is not unconstitutional under the state constitution, see Harris v. Alabama, ___ U.S. ___, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)); and what is going to happen in those noncapital cases based on crimes for which a jury, at the time of the ratification of the 1901 Constitution, imposed the sentence, e.g., murder, manslaughter, rape, robbery, and other offenses (see Ala.Code 1897, §§ 4858, 4862, 5444, 5479, 5050, 4420, 4758). Effective 12:01 a.m. on July 1, 1981, pursuant to legislation (enacted as § 6-5-547 was enacted), the power to sentence was removed from the jury and invested in the trial court (Ala.Code 1975, §§ 13A-5-1 through 13A-5-59).
I raised these questions in my dissent in Henderson v. Alabama Power Co. and in my concurrence in the result in Ex parte Giles. Now, by resurrecting the rule in Gilbreath v. Wallace to strike down another tort reform statute, the majority of this Court has come full circle and must, in future cases, address the fundamental question of who has the authority under the Constitution of Alabama to sentence in criminal cases, including capital cases, or face an equal protection and due process challenge to the way the majority of this Court interprets § 11 of the Alabama Constitution. For these reasons, I strongly dissent.

On Application For Rehearing
PER CURIAM.
APPLICATION OVERRULED.
ALMON, SHORES, KENNEDY, INGRAM, COOK, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX and HOUSTON, JJ., dissent.
*1355 HOOPER, Chief Justice (dissenting from the order overruling the application for rehearing).

I. THE NECESSITY FOR A REHEARING
I think the Court should rehear this case because the plurality's equal protection analysis gives no clear guidance as to when a right of equal protection has been infringed upon by the Legislature. The standard is left so uncertain that virtually no law passed by the Alabama Legislature could survive an equal protection challenge. In addition, I am totally at odds with the plurality's concept of the existence of an equal protection right under the Alabama Constitution. Mr. Smith participated in a full trial of his case, as was his right under § 11 of the Alabama Constitution, and that right was not infringed upon by the damages cap. The medical malpractice damages cap does not violate the Alabama Constitution. On the contrary, any attempt by the Judiciary to strike down a law of the Legislature without first determining thatbeyond a reasonable doubtit violates the fundamental law of the State of Alabama is a trespass by the Judiciary upon the power of the Legislature in violation of the separation of powers declared in the Alabama Constitution, Article III, §§ 42 and 43.

II. SEPARATION OF POWERS
The central question in this case is whether, beyond a reasonable doubt, a statute limiting punitive damages awards in wrongful death actions based on medical malpractice violates the fundamental law of the State of Alabama. This dissent addresses that question.
The preamble to the Constitution of Alabama of 1901 and §§ 42 and 43 state the standard that this Supreme Court must obey as part of the judicial branch of the government of Alabama:
PREAMBLE:
"We, the people of the State of Alabama, in order to establish justice, insure domestic tranquality, and secure the blessings of liberty to ourselves and our posterity, invoking the favor and guidance of Almighty God, do ordain and establish the following Constitution and form of government for the State of Alabama:"
"§ 42. Legislative, executive and judicial departments established.
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
"§ 43. Separation of powers.
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
The people of Alabama established the Constitution as the governing authority of the State. It governs all three branches the legislative, the executive, and the judicial. The legislative branch consists of the Legislature, representatives duly elected by the people of Alabama to pass the laws of this State. This Court long ago wrote:
"Speaking broadly, the Legislature of Alabama possesses all the legislative power which, under the federal Constitution, resides in the state, except where that power has expressly or impliedly been taken from it by the Constitution of the state."
State ex rel. Wilkinson v. Lane, 181 Ala. 646, 62 So. 31 (1913). Throughout the years it *1356 has continued to hold that "`So long as no constitutional limitations are exceeded, the Legislature is of supreme authority, and the courts, as well as all others, must obey.'" Champion v. McLean, 266 Ala. 103 at 118, 95 So.2d 82 (1957), quoting State v. Birmingham So. Ry., 182 Ala. 475, 479, 62 So. 77, 79 (1913). "The only power of [the Alabama Supreme] [C]ourt is to declare the law as enacted by the [legislature]." Champion v. McLean, 266 Ala. at 117-18, 95 So.2d at 97.
Only when the Legislature enacts a law that, beyond a reasonable doubt, violates the Alabama Constitution may the Judiciary strike it down. The very foundations of Alabama jurisprudence hold that no judgment of this Supreme Court can reverse or interfere with the Legislature so long as the Legislature acts within its constitutional limits. Ex Parte Screws, 49 Ala. 57 at 65 (1873). It is not the responsibility of the Judiciary to substitute its judgment for that of the Legislature regarding a particular law. Instead, "the legislature's power is plenary [and] [t]he Courts cannot look to the wisdom or folly, the advantages or disadvantages, of the [legislative action]." Opinion of the Justices No. 265, 381 So.2d 183 at 185 (Ala.1980). This Court has also stated:
"The judicial branch of government was not intended to be and will not presume to act as a super agency to control, revise, modify or set at naught the lawful acts of administrative agencies. It is under restraint (§ 43, Constitution 1901) [sic] from imposing its methods or substituting its judgment for that of the [other] branches of the government."
Finch v. State, 271 Ala. 499, 504, 124 So.2d 825, 830 (1960). Judicial overreaching defeats the requirement that we have "a government of laws and not of men." Ala. Const.1901, § 43. Laws that do not violate the fundamental law are those of the people, whose Constitution requires obedience by all three branches.
If the Judiciary has no standard by which to determine whether to strike down the laws of the Legislature, then no law is safe. Indeed, "it is not the function of the court to usurp the role of the legislature and to amend statutes under the guise of construction." Honeycutt v. Employees' Retirement System of Alabama, 431 So.2d 961, 964 (Ala. 1983). See also State v. Praetorians, 226 Ala. 259, 261, 146 So. 411, 413 (1933). When the Judiciary does so, it violates § 43 and "exercise[s] ... the legislative ... powers." Ala. Const.1901, § 43.
In 1983 this court held: "[I]t is not a function of this court to determine the wisdom of specific legislation unless a law has no rational relationship to its intended purpose." Beddingfield v. Central Bank of Alabama, N.A., 440 So.2d 1051, 1052 (Ala.1983). Because it is not this Court's function to usurp the role of the Legislature and to correct legislation under the guise of construction, see Town of Loxley v. Rosinton Water, Sewer & Fire Protection Authority, Inc., 376 So.2d 705 (Ala.1979); Employees' Retirement System of Alabama v. Head, 369 So.2d 1227 (Ala.1979); Childers v. Couey, 348 So.2d 1349 (Ala.1977), the Judiciary has always applied a very high standard in determining whether a law violates the fundamental lawthat standard is whether the violation has been shown beyond a reasonable doubt.
We, as members of the final court of appeal in the State of Alabama, the highest human authority in the judiciary branch, have a sacred duty to maintain this balance by our own self-restraint and self-government. We have consistently held that "Courts, above all others, are charged with a very sacred duty not to encroach upon the domain of other departments of government under our constitutional system of government." Hendrix v. Creel, 292 Ala. 541, 545, 297 So.2d 364, 367 (1974) (emphasis added); Finch v. State, 271 Ala. 499, 124 So.2d 825 (1960). Indeed, this Court has written:
"`No branch of the government is so responsible for the autonomy of the several governmental units and branches as the judiciary. Accordingly, we have held that courts cannot and will not interfere with the discretion vested in other units or branches of government.'"
*1357 Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907 (Ala.1992), quoting Finch v. State, 271 Ala. 499, 503, 124 So.2d 825, 829 (1960). Aside from the numerous prior holdings and other statements of this court, the basic writings supporting our American system of jurisprudence also warn against the dangers of mixing powers. In The Spirit of Laws Montesquieu wrote:
"But though the tribunals ought not to be fixed, the judgments ought; and to such a degree as to be ever conformable to the letter of the law. Were they to be the private opinion of the judge, people would then live in society, without exactly knowing the nature of their obligations...."
"Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression."
Charles de Secondat Montesquieu, The Spirit of Laws (1900).
Chancellor Waites said:
"The interference of the judiciary with legislative Acts, if frequent or on dubious grounds, might occasion so great a jealousy of this power and so general a prejudice against it as to lead to measures ending in the total overthrow of the independence of the judges.... The validity of the law ought not then to be questioned unless it is so obviously repugnant to the constitution that when pointed out by the judges, all men of sense and reflection in the community may perceive the repugnancy. By such a cautious exercise of this judicial check, no jealousy of it will be excited, the public confidence in it will be promoted, and its salutary effects be justly and fully appreciated."
James B. Thayer, "The Origin and Scope of the American Doctrine of Constitutional Law," 7 Harv.L.Rev. 129 (1893).
And in The Federalist No. 78 Alexander Hamilton said:
"The court must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body."
(Emphasis original.)
No human or human institution is infallible, whether it be the Legislature, the Governor, a judge, or a jury. All these human institutions exist to provide accountability to the others. This Court has said:
"The Legislative body may make mistakes. They may do wrong.... They are but men, and humanity is never, in a legislative sense, infallible. But this court can only interfere to control their mistakes, should such mistakes occur, when they involve a disregard of some constitutional restraint, or limitation of their powers, in the enactment of a law. Beyond this, courts cannot go."
Ex parte Screws, 49 Ala. 57, 65 (1873) (emphasis added). The phrase "checks and balances" has left an indelible mark upon our national and historical consciousness. Our form of government has sought institutional means to limit the dangers of human fallibility.
Historically, our culture has recognized the fallibility of human beings and the institutions they create and operate. The fact that our system of government is based on multiple institutions with multiple levels of authority prevents any one of those institutions from exceeding its own authority. Because the Judiciary acts as the final interpreter of the acts of the other two branches, it is even more critical for it to exercise self-restraint. Hendrix v. Creel, supra, 292 Ala. at 545, 297 So.2d at 367; Finch v. State, supra; Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907 (Ala.1992).
The jury trial, while the best legal system for judging other human beings, is not infallible. That is why there are myriad restraints *1358 placed upon a jury by the Legislature and the courts. There is certain evidence the jury may not even hear during (or before) a trial. There are certain jurors (those with bias) who may not serve on a jury. Sometimes, jurors must be sequestered and their right to travel restricted. All these restrictions upon a jury protect the parties to a trial from the fallible nature of the human beings sitting on the jury. Sometimes the source of the restrictions is in the Legislature (e.g., the Legislature's laws declaring that a jury in a capital murder case can only recommend a sentence to the trial judge; the judge may disregard its recommendation) and sometimes from within the judicial system itself (e.g., the rules governing the admissibility of evidence). In the criminal law context, the Legislature has removed the authority of a jury to impose a sentence. Only judges can sentence criminal defendants. However, even the judge may not go beyond the "cap" placed on the sentence range for a particular crime by the Legislature (e.g., the judge may not sentence a petty thief, who has no prior convictions, to life imprisonment). These restrictions upon the jury do not take away the constitutional rights of citizens; they preserve those rights. They protect the citizenry from the potential for error or excess a fallible jury always has.

III. EQUAL PROTECTION
I agree with Justice Houston's analysis of §§ 1, 6, and 22 of the Alabama Constitution of 1901 in his dissent to the original per curiam opinion in this case. There exists no right to equal protection under the Alabama Constitution. Opinion of the Justices No. 102, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949). Anyone pursuing an equal protection claim must do so under the Fourteenth Amendment to the United States Constitution.
Regardless of whether this court reaffirms its original decision in this case, it should grant a rehearing in order to provide a clear legal road map for state equal protection analysis. (While I do not agree that there is a state equal protection guarantee, if the plurality insists on finding one where none exists, then the Court should at least provide future litigants with a coherent legal analysis.) The per curiam opinion in this case makes six statements that might be construed as different equal protection tests to be applied in regard to statutes that limit punitive damages awards.
The first statement is: "We now hold that § 6-5-547 represents a similar form of `class legislation' that is unreasonable, and, therefore, violates the equal protection guarantee of the Constitution of Alabama." 671 So.2d at 1337. This language appears to set out a rational basis test for equal protection.
The second statement is taken from Moore v. Mobile Infirmary Association, 592 So.2d 156, 166 (Ala.1991):
"`[W]hether the classifications created under [the challenged statute] represent a reasonable exercise of legislative power depends on whether they are reasonably related to the stated objective, and on whether the benefit sought to be bestowed upon society outweighs the detriment to private rights occasioned by the statute.'"
671 So.2d at 1338 (emphasis added). This language seems to set up two prongs joined by an "and." The first prong resembles a rational basis test, and the second prong appears to be a balancing test between the benefit to "society" and the detriment to "private rights." Taken as a whole, the two prongs appear to set up a heightened form of scrutiny above mere rational basis scrutiny, possibly intermediate scrutiny.
The third statement is also taken from Moore. A court reviewing legislation is to ask "`whether the connection between the benefit sought to be conferred on society and the means employed to accomplish it, when weighed against the inequalities created by the statute's classifications, is so attenuated and remote as to constitute an unreasonable exercise of police power.'" 671 So.2d at 1339 (quoting Moore, 592 So.2d at 167). It is unclear whether this language is a balancing test, a rational basis analysis, or part of the analysis of one of the earlier stated tests.
*1359 The fourth statement also relates to Moore: "[T]he connection between the benefit sought from § 6-5-544(b) and the means used to obtain it was too `indirect and speculative' to support the classifications created." 671 So.2d at 1341 (quoting Moore, 592 So.2d at 170). Again, this language appears to be part of the analysis of an earlier stated test, but it remains unclear where the language might fit into the test, or even what that test might be.
The fifth statement of analysis appears to be original in this case: "Nothing but the strongest possible connection between the benefit sought and the means used to obtain it could justify such an odious burden on the fundamental liberty interest discussed above...." 671 So.2d at 1342. This language seems to describe an unprecedented step above strict scrutiny analysis, which at the federal level is reserved for potential violations of fundamental rights and equal protection problems with racial and ethnic classifications.
The sixth statement of analysis is much like the fifth. It says that "[t]his case involves neither the circumstances nor the necessary connection" and, therefore, "that § 6-5-547 violates the equal protection guarantee of the Constitution of Alabama." 671 So.2d at 1342 (emphasis added). Again, It is unclear whether this statement is a test in itself or is part of the analysis of an earlier-mentioned test. Regardless, a future party may be left wondering which circumstances or connections might satisfy the test.
These six statements of analysis will likely leave future parties wondering what our state law is with regard to equal protection analysis. If people cannot clearly understand the law, then they are likely to transgress it. People involved in future cases may wonder whether statutes limiting punitive damages in wrongful death actions are subject to rational basis analysis, intermediate scrutiny, strict scrutiny, or some other form of analysis. They may also wonder whether statutes limiting punitive damages awards in wrongful death actions are subject to a level of scrutiny different from that to which statutes limiting punitive damages awards in other actions are subject. It seems likely that this lack of clarity in Alabama equal protection analysis comes from the fact that the "Alabama Equal Protection Clause" does not exist.
Even if there were an equal protection right under the Alabama Constitution, no logical argument could support the contention that Ala.Code 1975, § 6-5-547, denies equal protection. Every citizen who seeks medical services (which is practically every citizen of the state) is treated equally by the statute. There is no class set aside for special treatment.
In addition, no fundamental right is at stake. In the case of Mr. Smith, the statute reduced the punitive damages awarded by the jury from $4,500,000 to $1,276,873. Does this reduction constitute state action devaluing the life of an Alabama citizen?!
A cap on punitive damages clearly affects an economic interest. The interest it affects is not a fundamental right like the right to marry, a denial of which would receive strict scrutiny. Yet, even marriage has regulations imposed upon it by state law, such as those relating to age, consanguinity, and blood tests. Some of these regulations impose positive prohibitions upon the right to marry. Certain laws forbid a person to marry certain people, e.g., one's brothers, sisters, first cousins, and other close relatives. Yet, these regulations clearly do not deny the right to marry; they merely regulate that right and preserve marriage as a unique and sacred institution. The cap on punitive damages also does not deny a fundamental right.
This Court should grant a rehearing in order to clarify the analysis. No matter what an individual Justice's opinion regarding this case may be, the Court should set out a clearer legal road map for state equal protection analysis. We must give the people of Alabama a reasonable capacity to understand and to comply with the standard.

IV. RIGHT TO TRIAL BY JURY
Mr. Smith was not denied his right to trial by jury by the medical malpractice damages *1360 cap. He had the trial by jury guaranteed him under Alabama Constitution § 11. The jury decided in his favor. The Legislature had passed a law that limited the amount of punitive damages a jury can award in a medical malpractice case. The Legislature imposes restrictions on the types of criminal sentences, amounts of awards, even the existence of a cause of action itself. In Gilbreath v. Wallace, 292 Ala. 267, 269, 292 So.2d 651, 652 (1974), this Court ruled that "Having conferred such a right [the right to a trial by jury in a case where that right had not previously existed], the legislature has the power to abolish that right. It therefore follows that the legislature might also constitutionally limit or abridge that right." Mr. Smith experienced no denial of the right to trial by jury due to § 6-5-547.
The argument about regulating marriage as an example of the power of the Legislature to regulate a fundamental right applies just as strongly to the question of the right to trial by jury. The jury system is not only constitutional, but it is the best system we know for human beings to resolve their disputes. The obvious difficulty is trying to reach a just verdict for the individual and also to achieve the state's interest in not destroying defendants. The danger in destroying defendant corporations and doctors is the loss of jobs and medical care to the people of Alabama, a danger the legislature has an undisputed right to seek to avoid.
Sentencing a criminal defendant provides both a punishment and a deterrence to future bad conduct. Awarding punitive damages in a civil case also provides both a punishment and a deterrence to future bad conduct. They are in principle the same. In the criminal context, only a sentence of death will destroy a criminal defendant. Never are punitive damages awarded for the purpose of destroying a civil defendantonly for the purpose of punishing the defendant and deterring the defendant and others from future similar bad conduct.
When a trial judge rejects a jury's recommendation against imposing a death sentence, the judge takes away the jury's recommendation. The defendant's right to a jury trial is not thereby taken away also. The Legislature gave the trial judge the right to reject the recommendation of death. In fact, the Legislature has the right to totally abolish the death penalty, however wise or unwise one may feel it would be for the Legislature to do so. In the same way, the Legislature should have the right to place a cap on punitive damages that a jury can award.
The right to a jury trial is maintained in both the criminal case and the civil case when such laws affect the jury's decision. Only the extent of that right is controlled by the Legislature. In the capital case, a judge controls the ultimate sentence, as allowed by the Legislature. In Ex parte Hays, 518 So.2d 768 (Ala.1986), this Court stated: "Both the old and the new death penalty statutes clearly embody the principle that the judge is the final sentencing authority and may, therefore, override the recommendation by the jury." In a punitive damages case, the Legislature controls. The Legislature should have more control in a civil punitive damages case than in the criminal case, because of the potential for destruction that punitive damages can have upon the welfare of the entire state.
Common sense tells us that a cap on punitive damages should be available under the law. What that cap should be we are not to say. Only the Legislature speaks to this issue. Why? Because it is the Legislature's right to make decisions and pass laws that affect the condition of this state in the areas of jobs and medical care. The Judiciary cannot pass laws to encourage the growth of jobs and access to medical care. The Judiciary may review legislation only to determine if it is clear beyond a reasonable doubt that the legislation violates the fundamental law.
Many factors go into a decision of the jurors, e.g., the difference in legal talents of the lawyers before the jury, the demeanor of a lawyer or judge, an unintended mannerism *1361 of a trial judge, the peculiar experiences of the jurors unrelated to the evidence at trial (e.g., bias against a doctor who had been perceived as having a poor bedside manner), etc. The voir dire process cannot cull all these outside influences and biases. The jury may not hear certain items of evidence, may not read certain outside materials, may not invent a new cause of action, and may not award compensatory damages beyond the actual loss of the plaintiff. For example, the judge may instruct the jurors to disregard a certain statement made by a witness, meaning they are not even to think about that statement in making their decision. These laws and rules of procedure constantly regulate, supervise, and control the actions and decisions, even the thoughts, of jurors. Yet those Justices composing the majority in this case do not consider unconstitutional any of these rules and laws that control and limit a jury's decision-making power. Why the difference?

V. INCONSISTENT HOLDING
After stating that a reduction of punitive damages by an Act of the Alabama Legislature violates an alleged equal protection guarantee in the Alabama Constitution, those justices making up the majority in this case then turned completely around and, on their own authority, reduced the punitive damages award from $4,500,000 to $2,500,000. I disagree with the reasoning used in the per curiam opinion. That opinion says that an act of the Legislature may not set a limit upon punitive damages awards because such an act would devalue human life and deprive an Alabama citizen of "a fundamental right... of liberty." 671 So.2d 1350. Does this Court claim, by that decision, that it can devalue the life of an Alabama citizen or deprive that citizen of a "fundamental right... of liberty," but that the Legislature cannot? According to the reasoning of the per curiam opinion, it appears that it can.
While agreeing that the damages need reduction, I do not agree with the reasoning of the per curiam opinion. Remittitur is a valid and constitutional action this Court can take.
However, in this case, the damages should be reduced to the amount set by Ala.Code 1975, § 6-5-547, a statute enacted pursuant to the reasoning of the duly elected representatives of the people of Alabama. Section 43 of the Alabama Constitution of 1901 states: "[T]he judicial [branch] shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men." The Legislature, composed of the duly elected representatives of the citizens of Alabama, passed a law to protect those citizens. I cannot conclude that that law, clearly and beyond a reasonable doubt, violates the fundamental law of this state. On the contrary, I think it clear, beyond a reasonable doubt, that that statute does not violate our fundamental law. This Court should interpret those laws intended to protect Alabama citizens, not abolish them.
On the old Mobile County Courthouse appears this statement: "The laws of our land build on reason and experience, and the chief of all laws is the will of the people." I heartily endorse that principle; therefore, I must respectfully dissent.
MADDOX, Justice (dissenting from the order overruling the application for rehearing).
On original deliverance, I wrote a dissenting opinion, and I argued with what Judge Houston wrote in dissent, but I did not spell out all the specific reasons for my dissent. However, in a subsequent case, Ray v. Anesthesia Associates of Mobile, P.C., [Ms. 1931023, Sept. 22, 1995] ___ So.2d ___ (Ala. 1995), I discussed in some detail the reason why I believe the right to trial by jury guaranteed by § 11 of our State Constitution refers only to the right to have a jury of 12 persons who must reach a unanimous verdict. In Ray v. Anesthesia Associates of Mobile, P.C., I said:
"In Smith v. Schulte, this Court cited Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), to support its holding that the Legislature could not impose a cap on punitive damages in a wrongful *1362 death case, on the ground that to do so would violate a plaintiff's right to trial by jury. I participated in the decision in Gilbreath v. Wallace, and I recall the debates surrounding the decision in that case. Gilbreath v. Wallace was a will contest case, and the issue in that case was whether, at the time of the adoption of the 1901 Constitution, a party was entitled to a trial by jury in a will contest case. That case did not address whether the Legislature had the power to set a cap on punitive damages in a statutorily created wrongful death action, the subject matter of this case. Consequently, the decision in this case and the decision in Smith v. Schulte cannot be bottomed upon the principle of law set out in Gilbreath v. Wallace.

"In Gilbreath v. Wallace, this Court discussed only the basic and fundamental right to trial by jury, or as it is stated in the opinion, the `substance' of the right to trial by jury, which `is confined to those classes of cases in which the right existed at common law, or in which it was used at the time of the adoption of the Constitution.' Gilbreath v. Wallace, 292 Ala. 267, 270, 292 So.2d 651, 653 (1974), quoting Alford v. State ex rel. Attorney General, 170 Ala. 178, 188-89, 54 So. 213, 215-16 (1910) (Mayfield, J., dissenting).
"Of course, this statement of the rule is merely a restatement of the principle declared in Thomas v. Bibb, 44 Ala. 721, 722 (1870): `[T]he right of trial by jury is confined to cases in which it was conferred by the common law, to suits which the common law recognized amongst its old and settled proceedings and suits, in which legal rights were to be ascertained and determined, in contradistinction to those in which equitable rights alone were recognized, and equitable remedies were administered, or in which was a mixture of law and equity.' (Emphasis added) (citing Story on Const. § 1763; Tims v. State, 26 Ala. 165 (1855); cf., Boring v. Williams, 17 Ala. 510 (1850)).
"It is plain that Gilbreath v. Wallace does not address the issue presented in this case, but addresses only whether the Legislature could reduce the number of jurors from 12 to 6. A reading of the opinion in Gilbreath v. Wallace shows that the predominate issue was whether, at common law, a person was entitled to a jury in a will contest case. In fact, Justice Jones, the author of the Gilbreath v. Wallace opinion, discussed in some detail whether `an action to contest the validity of a will [was] a proceeding sui generis, unknown to the common law,' 292 Ala. at 270, 292 So.2d at 654, as argued by the appellee in that case. He wrote:
"`In the common law of England there was no probate court. Bequests and legacies were handled by the ecclesiastical court and devises by the law court. At law, the heir of a testator could never be deprived of his inheritance without the intervention of a jury to try the issue of devisavit vel non (literal translation: will or no willis the paper purporting to divest the heir of his inheritance the true last will of the deceased, legally executed by him while competent and without the interposition of undue influence?). Somewhat later, wills were submitted to the conscience of the Chancellor. When the question of the validity of a will arose in Chancery, the heir-at-law was entitled to have the issue of devisavit vel non "made up" and sent out of that court to a court of law and submitted to a jury. See Bennet v. Vade, 2 Atk. 324, 26 Eng.Reprint 597 (1742), and Webb v. Cloverden, 2 Atk. 424, 26 Eng.Reprint 656 (1742). This right was recognized in one of our early decisions, Kennedy's Heirs and Executors v. Kennedy's Heirs, 2 Ala. 571, 625 (1841), where it was stated:
"`"It may be regarded a settled practice of equity, to direct an issue of law, where a question arises upon the validity of a will, and it would be irregular for the Court to render a decree against the heir until the validity of the devise had been found by a jury."
"`Prior to 1821 (the year of the legislative enactment conferring the right to *1363 contest wills in the probate court), Alabama was governed by a statute, Clay's Digest 598, § 15 (1843), enacted in 1807 through the Mississippi Territorial Government, which permitted the contest of wills in equity. This statute was the forerunner to Tit. 61, §§ 62 and 67, Code of Alabama 1940 (Recomp.1958). The latter section and the earlier provision authorize a jury trial, but the language is merely permissive, i.e., that the court may direct an issue to be tried to a jury. Nevertheless, the Court in Hill v. Barge, 12 Ala. 687, 692 (1848), construing the earlier act, declared that the right was absolute on demand of either party and not committed to the discretion of the Chancellor.
"`Thus, it can be seen that in Alabama there has always been a right to trial by jury in a will contest. The Texas Supreme Court in Cockrill v. Cox, 65 Tex. 669, 674 (1876), when faced with a similar issue, held:
"`"The provision in the Constitution of 1876, that the right of trial by jury shall remain inviolate, must be considered as perpetuating the right in the cases, in which, at the date of its adoption, it had been so universally recognized and firmly established, as in the contests arising over the proof of wills."'
"292 Ala. at 270-71, 292 So.2d at 654. (Emphasis original.)"
___ So.2d at ___.
In Ray v. Anesthesia Associates of Mobile, P.C., I asked this question: "Why did Justice Jones discuss whether a will contest case was a `law' case or an `equity' case?" ___ So.2d at ___. I answered that question by saying that a party's substantive right to trial by jury is always determined by whether the party's action is "at law" or "in equity," unless the right to trial by jury has been granted by statute.
Because the Court relies so strongly upon the holding in Gilbreath v. Wallace, it is instructive to consider why the Court determined that there was a substantive right to trial by jury in that case. The Court in Gilbreath v. Wallace said:
"[I]f the right to a trial by jury in a will contest is a right secured by the Alabama Constitution, then the Legislature may not abridge or limit the substance of that right."
292 Ala. at 269, 292 So.2d at 652.
It is not accidental that the word "substance" was italicized in the original opinion in Gilbreath v. Wallace, because that case did not hold, and should not be cited as holding, that a party had a common law right to have a jury fix the amount of punitive damages that could be awarded.
In order to get a better understanding of the right to trial by jury at common law, I have reviewed Sir Matthew Hale's The History of the Common Law of England (1739), reprinted in Classics of British Historical Literature, at 160-67 (John Clive, ed., 1971), and I set out here pertinent portions of that treatise to show the composition of the common law jury, its role, especially its role to be impartial, and the role of the court in assuring that justice would be done, according to law:

"Touching Trials by Jury
"Having in the former Chapter somewhat largely treated of the Course of Descents, I shall now with more Brevity consider that other Title of our Law which I before propounded (in order to evidence the Excellency of the Laws of England above those of other Nations,) viz. The Trial by a Jury of Twelve Men; which upon all Accounts, as it is settled here in this Kingdom, seems to be the best Trial in the World: I shall therefore give a short Account of the Method and Manner of that Trial, viz.

"First, The Writ to return a Jury, issues to the Sheriff of the County: And,
"1st, He is to be a Person of Worth and Value, that so he may be responsible for *1364 any Defaults, either of himself or his Officers. And, 2dly, Is sworn, faithfully and honestly to execute his Office. This Officer is entrusted to elect and return the Jury, which he is obliged to do in this Manner. 1. Without the Nomination of either Party. 2. They are to be such Persons as for Estate and Quality are fit to serve upon that Employment. 3. They are to be of the Neighbourhood of the Fact to be inquired, or at least of the County or Bailywick. And, 4. Anciently Four, and now Two of them at least are to be of the Hundred. But Note, This is now in great Measure altered by Statute.

"Secondly, Touching the Number and Qualifications of the Jury.
"1st, As to their Number, though only Twelve are sworn, yet Twenty-four are to be returned to supply the Defects or Want of Appearance of those that are challenged off, or make Default. 2dly, Their Qualifications are many, and are generally set down in the Writ that summons them, viz. 1. They are to be Probi & legales Homines. 2. Of sufficient Freeholds, according to several Provisions of Acts of Parliament. 3. Not Convict of any notorious Crime that may render them unfit for that Employment. 4. They are not to be of the Kindred or Alliance of any of the Parties. And, 5. Not to be such as are prepossed or prejudiced before they hear their Evidence.
"....
"Sixthly, When the Jurors appear, and are called, each Party has Liberty to take this Challenge to the Array itself, if unduly or partially made by the Sheriff; or if the Sheriff be of Kin to either Party, or to the Polls, either for Insufficiency of Freehold, or Kindred or Alliance to the other Party, or such other Challenges, either Principal, or to the Favour, as renders the Juror unfit and incompetent to try the Cause, and the Challenge being confess'd or found true by some of the rest of the Jury, that particular incompetent Person is withdrawn.
"Seventhly, Then Twelve, and no less, of such as are indifferent and are return'd upon the principal Pannel, or the Tales, are sworn to try the same according to their Evidence.
"Eighthly, Being thus sworn, the Evidence on either Part is given in upon the Oath of Witnesses, or other Evidence by Law allowed, (as Records and ancient Deeds, but later Deeds and Copies of Records must attested by the Oaths of Witnesses) and other Evidence in the open Court, and in the Presence of the Parties, their Attornies, Council and all By-standers, and before the Judge and Jury, where each Party has Liberty of excepting, either to the Competency of the Evidence, or the Competency or Credit of the Witnesses, which Exceptions are publickly stated, and by the Judges openly or publickly allowed or disallowed, wherein if the Judge be partial, his Partiality and Injustice will be evident to all By-standers; and if in his Direction or Decision he mistake the Law, either through Partiality, Ignorance, or Inadvertency, either Party may require him to seal a Bill of Exception, thereby to deduce the Error of the Judge (if any were) to a due Ratification or Reversal by Writ of Error.
"Ninthly, the Excellency of this Open Course of Evidence to the Jury in the Presence of the Judge, Jury, Parties and Council, and even of the adverse Witnesses, appears in these Particulars:
"....
"5thly, And further, The very Quality, Carriage, Age, Condition, Education, and Place of Commorance of Witnesses, is by this Means plainly and evidently set forth to the Court and the Jury, whereby the Judge and Jurors may have a full Information of them, and the Jurors, as they see Cause, may give the more or less Credit to their Testimony, for the Jurors are not only Judges of the Fact, but many Times of the Truth of Evidence; and if there be just Cause to disbelieve what a Witness swears, they are not bound to give their *1365 Verdict according to the Evidence or Testimony of that Witness; and they may sometimes give Credit to one Witness, tho' oppos'd by more than one. And indeed, it is one of the Excellencies of this Trial above the Trial by Witnesses, that altho' the Jury ought to give a great Regard to Witnesses and the Testimony, yet they are not always bound by it, but may either upon reasonable Circumstances, inducing a Blemish upon their Credibility, tho' otherwise in themselves in Strictness of Law they are to be heard, pronounce a Verdict contrary to such Testimonies, The Truth whereof they have just Cause to suspect, and may and do often pronounce their Verdict upon one single Testimony, which Thing the Civil Law admits not of.
"Tenthly, Another Excellency of this Trial is this; That the Judge is always present at the Time of the Evidence given in it: Herein he is able in Matters of Law emerging upon the Evidence to direct them; and also, in Matters of Fact, to give them a great Light and Assistance by his weighing the Evidence before them, and observing where the Question and Knot of the Business lies and by shewing them his Opinion even in Matter of Fact, which is a great Advantage and Light to Lay-Men: And thus, as the Jury assists the Judge in determining the Matter of Fact, so the Judge assists the Jury in determining Points of Law, and also very much in investigating and enlightening the Matter of Fact, whereof the Jury are Judges.
"Eleventhly, When the Evidence is fully given, the Jurors withdraw to a private Place, and are kept from all Speech with either of the Parties till their Verdict is delivered up, and from receiving any Evidence other than in open Court, where it may be search'd into, discus'd and examin'd. In this Recess of the Jury they are to consider their Evidence, and if any Writings under Seal were given in Evidence, they are to have with them; they are to weigh the Credibility of Witnesses, and the Force and Efficacy of their Testimonies, wherein (as I before said) they are not precisely bound to the Rules of the Civil Law, viz. To have two Witnesses to prove every Fact, unless it be in Cases of Treason, nor to reject one Witness because he is single, or always to believe Two Witnesses if the Probability of the Fact does upon other Circumstances reasonably encounter them; for the Trial is not here simply by Witnesses, but by Jury; nay, it may so fall out, that the Jury upon their own Knowledge may know a Thing to be false that a Witness swore to be true, or may know a Witness to be incompetent or incredible, tho' nothing be objected against him, and may give their Verdict accordingly.
"Twelfthly, When the whole Twelve Men are agreed, then and not till then, is their Verdict to be received; and therefore the Majority of Assentors does not conclude the Minority, as is done in some Countries where Trials by Jury are admitted: But if any one of the Twelve dissent, it is no Verdict, nor ought to be received. It is true, That in ancient Times, as Hen. 2. and Hen. 3.'s Time, yea, and by Fleta in the Beginning of Edw. I.'s Time, if the Jurors dissented, sometimes there was added a Number equal to the greater Party, and they were then to give up their Verdict by Twelve of the old Jurors, and the Jurors so added; but this Method has been long Time antiquated, notwithstanding the Practice in Bracton's Time, lib. 4. cap. 9. and Fleta, lib. 4. cap. 9 for at this Day the entire Number first empanell'd and sworn are to give up an unanimous Verdict, otherwise it is none. And indeed this gives a great Weight, Value and Credit to such a Verdict, wherein Twelve Men must unanimously agree in a Matter of Fact, and none dissent; though it must be agreed, that an ignorant Parcel of Men are sometimes governed by a few that are more knowing, or of greater Interest or Reputation than the rest."
(Emphasis original.)
This statement from this learned treatise shows unequivocally that the substance of the right to trial by jury refers only to the *1366 number of jurors (12) and the fact that their verdict must be unanimous.
It is regrettable, therefore, that this Court, not only in this case, but in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala. 1993), and others, could construe § 11 of the Alabama Constitution in such a manner as to give a jury of 12 persons the right to nullify an act of the State Legislature. It is especially regrettable that jury nullification is selectively permitted by this Court in civil cases, excepting those cases in which cities and counties are defendants, wherein a jury of 12 persons can be stripped of its power without constitutional ramifications. Regarding this selective application, I agree completely with what Justice Houston wrote in his dissent from the per curiam opinion in this case, but I now write separately because I am the only member of this Court who participated in Gilbreath v. Wallace, which has been cited for a principle of law that is not in that case.
HOUSTON, Justice (dissenting from the order overruling the application for rehearing).
Only 56 days after this Court released its opinion in this case, it released a decision in Ex parte Jackson, 672 So.2d 810 (Ala.1995). To express my views in this case, I readopt my concurrence in the result in Jackson, for it shows the extent of the inconsistencies to which this Court has had to resort in interpreting § 11 of the Constitution of Alabama of 1901, in order to strike down caps that were imposed on punitive damages as part of the 1987 tort reform legislation.
In my opinion, as to civil defendants whose property is taken to an extent in excess of legislatively mandated limits, this inconsistency violates their due process rights and their rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment. In my opinion concurring in the result in Jackson, I wrote:
"In my dissent in Smith v. Schulte, ... I asked:
"`[W]hat is going to happen in future capital cases in which a jury does not unanimously sentence to death but the trial court does sentence to death (which is permissible under Alabama law, assuming that it is not unconstitutional under the state constitution, see Harris v. Alabama, ___ U.S. ___, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)) [?]'
"Today, I received my answer. Nothing.
"At the time the Constitution of Alabama of 1901 was ratified, juries in Alabama sentenced to death or life imprisonment in capital cases and fixed the amount of compensatory and punitive damages in civil cases.
"In reviewing death penalty cases, this Court must notice error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceeding. Ex parte Bankhead, 585 So.2d 112, 117 (Ala.1991).
"In this case, a jury did not unanimously recommend the death sentence. In fact, a majority of the jury recommended life imprisonment without parole. At the time of the ratification of the 1901 Constitution, this would not have been a valid sentence. Ala.Code 1897, § 4858.
"In Gilbreath v. Wallace, 292 Ala. 267, 269-70, 292 So.2d 651, 653-54 (1974), this Court held: `Alabama's Constitution effected a "freezing" of the right to jury trial as of 1901" in both `civil and criminal cases.'
"In Ex parte Giles, 632 So.2d 577 (Ala. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994), quoting Crowe v. State, 485 So.2d 351, 364 (Ala. Crim.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985), a majority of this Court held in effect that `"Article I, Section 11, confers the right of trial by jury as [it] existed at common law and the time of Alabama's first [1819] state constitution"' (emphasis added in Giles) and that `a historical review' of the right was the `starting point in any § 11 analysis.' 632 So.2d at 580-81. At common law and at the time *1367 of the first Alabama Constitution, juries convicted and the court alone sentenced.
"In Smith v. Schulte, supra, the majority of this Court reembraced Gilbreath v. Wallace, supra, to hold that § 11 prohibited the legislature from capping at $1,000,000 the amount that could be awarded in a medical malpractice wrongful death action, an action that was unknown to the common law and that was not in existence at the time of the first Alabama Constitution, but was in existence at the time of the ratification of the Constitution of 1901. Therefore, in Smith v. Schulte, the majority of this Court departed from its Giles holding that § 11 `confers the right to trial by jury as [it] existed at common law and the time of Alabama's first state constitution' and departed from its historic analysis of the claimed right, because there was no right to recover for wrongful death at common law or at the time of the first Alabama Constitution. This was a right that was solely a creature of the legislature created after the first Constitution, but before the 1901 Constitution.
"If I had voted with the majority in Smith v. Schulte, I would have to conclude that it is plain error to affirm Jackson's sentence to death; however, I did not vote with the majority, because, in my view, the majority opinion in Smith v. Schulte is plain error.
"The majority of this Court has made Art. I, § 11, of the Alabama Constitution its plaything. It can restrict § 11 so as to permit the legislature, after the ratification of the 1901 Constitution, to impose a $100,000 maximum amount of damages that can be recovered by an individual in a tort action against a governmental entity [Ala. Code 1975, § 11-93-2, enacted in 1977], when there was no such limitation on tort damages before the ratification of the 1901 Constitution (see Garner v. Covington County, 624 So.2d 1346 (Ala.1993)) [by reviewing the minutes of the Alabama Constitutional Convention of 1901]; it can broaden § 11 wide enough to strike down a $250,000 cap on punitive damages [Ala. Code 1975, § 6-11-21 (1987) ] (Henderson v. Alabama Power Co., 627 So.2d 878 (Ala. 1993)) [refusing to review the minutes of the Alabama Constitutional Convention of 1901]; it can shrink § 11 small enough to be able to affirm a court's, as opposed to a jury's, sentence to death, even though sentencing to death was a jury's function when the 1901 Constitution was ratified (see Ex parte Giles, 632 So.2d 577 (Ala. 1993)); it can again broaden § 11 wide enough to strike down a $1,000,000 cap on a wrongful death recovery in a medical malpractice action (Smith v. Schulte, supra) [Ala.Code 1975, § 6-5-547 (1987)]; and today it shrinks § 11 so small that it can ignore it (`the jury returned an advisory verdict, by a majority vote of seven to five, recommending a sentence of life imprisonment, without parole,' ___ So.2d at ___) and affirm Jackson's death sentence. I dissented in Henderson v. Alabama Power Co. and in Smith v. Schulte. I concurred in the result in Ex parte Giles. I concur in the result in this case, because I believe the legislature had the power to impose caps on punitive damages and to fix the method of punishment for crime (Henderson v. Alabama Power Co., 627 So.2d at 905-08 (Houston, J., dissenting)); Ex parte Giles, 632 So.2d at 587 (Houston, J., concurring in the result). I regret that the abolition of caps on punitive damages was such a felt necessity of the times that the majority of this Court played a sleight-of-hand trick to justify striking these caps, while trying not to have to declare unconstitutional much of Chapter 5 of Title 13A of the Code (Ala.Code 1975, §§ 13A-5-1 through 13A-5-59), `Punishments and Sentences.'
"I am convinced that Henderson v. Alabama Power Co. and Smith v. Schulte were wrongly decided. If there is a due process or equal protection violation as a result of this waffling by the majority, it would be the civil defendants whose property was taken in excess of legislatively mandated limits who would have a right to have that violation redressed, not the criminal defendants whose punishment has been legally prescribed by legislation.

*1368 "Therefore, I concur in the result. However, if I had voted with the majority of the Court on the right-to-jury-trial issue in Henderson v. Alabama Power Co. or in Smith v. Schulte, I would have been unable to vote to affirm Jackson's sentence of death."
672 So.2d at 811-12.
NOTES
[1] Section 6-5-544(b) limited to $400,000 any recovery of non-economic damages in medical malpractice actions.
[2] Occasionally, federal courts apply a similar test, that is, one of "balancing the government's interests against the interests of the individuals affected." Gideon v. Alabama State Ethics Comm'n, 379 So.2d 570, 574 (Ala.1980) (citing Nixon v. Administrator of General Services, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and Plante v. Gonzalez, 575 F.2d 1119 (5th Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979)).
[3] That standard of review validates any statute that is "rationally related" to a "proper governmental purpose." Gideon v. Alabama State Ethics Comm'n, 379 So.2d 570, 574 (Ala.1980).
[4] Section 6-5-540 provides in pertinent part:

"It is hereby declared by the Legislature of the State of Alabama that a crisis threatens the delivery of medical services to the people of Alabama and the health and safety of the citizens of this state are in jeopardy. In accordance with the previous declaration of the legislature contained in Act 513 of the regular session of the 1975 Alabama Legislature it is the declared intent of this legislature to insure that quality medical services continue to be available at reasonable costs to the citizens of the State of Alabama. This legislature finds and declares that the increasing threat of legal actions for alleged medical injury causes and contributes to an increase in health care costs and places a heavy burden upon those who can least afford such increases, and that the threat of such actions contributes to expensive medical procedures to be performed by physicians and other health care providers which otherwise would not be considered necessary, and that the spiraling costs and decreasing availability of essential medical services caused by the threat of such litigation constitutes a danger to the health and safety of the citizens of this state, and that this article should be given effect immediately to help control the spiraling cost of health care and to insure its continued availability."
[5] The Court contrasted the close scrutiny exercised by the federal judiciary in regard to state "capital sentencing procedure" with the great deference afforded states in the area of "punitive damages assessments." Ex parte Giles, 632 So.2d at 582 (citing TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). This distinction was the most conspicuous basis for the Court's holding a distinction based on the Supremacy Clause of the Federal Constitution and the consequent subordination of § 11 doctrine in capital cases. That basis is obviously inapplicable here.
[6] Dr. Schulte and PAM also contend that the trial court committed errors of various species relating to the conduct of the trial. We have considered these contentions and have found them to be without merit.
[7] This section reads, in toto: "That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."

Repeatedly the Court has held that this provision, in conjunction with §§ 6 and 22 of Article I of the Constitution of 1901, confers a guarantee of equal protection. See, e.g., Ex parte Jackson, 516 So.2d 768 (Ala.1986); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991).
My position has been, and remains, that the Constitution of 1901 guarantees equal protection of the laws. That equal protection is guaranteed by Art. I, § 1, of the Constitution, is buttressed by the language of §§ 6 and 22.
[8] Sometimes litigants will deliberately not seek to claim a federal constitutional right, believing that their individual State courts will afford them more relief than the United States Supreme Court would under the Federal Constitution. Apparently, that is the strategy of the plaintiff in this case.
[9] Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995) (Houston, J., concurring in the result).
[10] Indian Rivers Community Health Center v. City of Tuscaloosa, 443 So.2d 894 (Ala.1983) ("the traits which characterize a suspect class ... include a history of disenfranchisement and stereotyping, and `an immutable characteristic determined solely by the accident of birth'") (citing Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973)).
[11] Now Justice Anthony Kennedy, while he was sitting on the Ninth Circuit Court of Appeals, rejected this same fundamental rights argument, stating that the argument's "logic would apply to all areas of civil law in every state, and all civil remedies would be subject to the strictest standard of review." In re Paris Air Crash, 622 F.2d 1315, 1319 (9th Cir.1980).
[12] "The criminal justice system exists to deter the taking of life and provides a much greater deterrent than a punitive damage award to heirs of a decedent against a guilty party, which award under most circumstances involving homicide would likely be difficult to collect." Johnson v. International Harvester Co., 487 F.Supp. 1176, 1179 (D.N.D.1980).
[13] See, e.g., Johnson v. International Harvester Co., 487 F.Supp. 1176 (D.N.D.1980); In re Paris Air Crash, 622 F.2d 1315 (9th Cir.1980); In re Air Crash Disaster Near Chicago, Ill., 644 F.2d 594 (7th Cir.1981); Smith v. Printup, 254 Kan. 315, 866 P.2d 985 (1993); Berman v. United States, 572 F.Supp. 1486 (N.D.Ga.1983); Lynch v. Port of Houston Authority, 671 S.W.2d 954 (Tex.App.1984).
[14] See, e.g., Potomac Electric v. Smith, 79 Md. App. 591, 558 A.2d 768 (1989); Blue Cross of Massachusetts v. Travaline, 398 Mass. 582, 499 N.E.2d 1195 (1986).
[15] I have disagreed with the majority's reasoning (see Tatum v. Schering Corp., 523 So.2d 1042, 1047-63 (Ala.1988) (Houston, J., dissenting)); however, because no constitutional phantom, but only statutory construction, is involved, I no longer dissent on this issue.